Exhibit A

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | )  |
|---|---|
| IN RE UNOPPOSED APPLICATION OF WEST FACE CAPITAL INC. FOR AN ORDER GRANTING LEAVE TO ISSUE A DOCUMENT SUBPOENA PURSUANT TO 28 U.S.C. § 1782 | )  )  )  )  ) |

Civil Action No.

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A attached.

| Place: Jaime A. Bartlett, Sidley Austin LLP, 555 California Street, Suite 2000, San Francisco, CA 94104 | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      04/08/2019

CLERK OF COURT

_____          OR          _____
*Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   West Face Capital Inc. , who issues or requests this subpoena, are:

Jaime A. Bartlett, Sidley Austin LLP, 555 California Street, San Francisco, CA 94104 jbartlett@sidley.com 415-772-1228

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit A

## DEFINITIONS

As used in this Exhibit A, the following words shall have the definitions as listed below.

1.  The terms "Google," "You," "Your," and "Yours" mean and include Alphabet Inc., Google LLC and Google, Inc. and any of their parents, subsidiaries, affiliates, divisions, branches, agencies, representative offices, predecessors, and successors, and such entities' principals, members, officers, directors, shareholders, managers, employees, agents, and representatives.

2.  The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A)-(B), which includes "any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or any designated tangible things."

3.  "Google Accounts" means each account Google maintains that is associated with any of the following email addresses:

    phil.elwood@gmail.com

    phil.ewood@gmail.com

    emmanuelrosen@gmail.com.

4.  "Google Services" means all account services provided by Google, including but not limited to Gmail, Google Drive, Google Docs, Google Sheets, Google Voice, Google AdWords, Google Calendar, YouTube, Google Contacts, Google Photos, Google Hangouts,

1

Google+, Allo and Duo.

5.    "Header Information" means the to/recipient, any auto-forwarding recipients, from/author, cc, bcc, date, time, and attachment name(s) fields of an email, chat or other forms of communication.

6.    "ID" means identification.

7.    "IP" means internet protocol.

8.    "Payment Information" means any credit card information, bank account information, or other information concerning payment methods that Google possesses relating to a Google Account, and includes the following information, if applicable:

    a.  Type of credit cards and associated bank or credit card company;

    b.  Names as they appear on each payment card;

    c.  Billing address for each payment card;

    d.  Name of check account holder;

    e.  Name of bank; and

    f.  Any other personally identifying information associated with a payment method.

9.    "Person" means any natural person or any business, legal or governmental entity or association.

10.    "West Face" means West Face Capital Inc. and any of its principals, employees, directors, subsidiaries or affiliates, including, but not limited to, Gregory Boland.

### INSTRUCTIONS

A.    The requests below (the "Requests") require that You produce documents in a manner that complies with the requirements of Federal Rule of Civil Procedure 45(e). These

2

Requests require You to produce all documents called for herein that were created, originated or obtained by You or Your attorneys, employees, agents, or representatives, or that are in Your or Your attorneys', employees', agents', or representatives' possession, custody or control, from all files or other sources that contain responsive documents, wherever located and whether active, in storage, or otherwise, including, without limitation, all documents that were created, originated or obtained by You or Your attorneys, employees, agents or representatives.

B.    You shall identify and describe all documents responsive to these Requests that were within Your possession, that were destroyed or that are no longer in Your possession.

C.    Where only a portion of a document relates or refers to the subject indicated, the entire document is to be produced nevertheless, along with all attachments, appendices and exhibits.

D.    Where a claim of privilege is asserted in objecting to these Requests, You shall identify the nature of the privilege (including work product) which is being claimed, and the following information shall be provided in the objection: (a) the type of document, *e.g.*, letter or memorandum; (b) the general subject matter of the document; (c) the date of the document; (d) the author(s) of the document; (e) the addressee(s) of the document; (f) the recipient(s) of the document; and (g) where not apparent, the relationship of the author(s), addressee(s) and recipient(s) to each other, as well as any additional information required under the Federal Rules of Civil Procedure or other applicable law.

E.    If You object to any of the Requests herein, You shall state the specific grounds asserted for objecting and for not producing the document or tangible thing, and identify each such item by its name. Furthermore, You shall identify those documents or things that You will produce

notwithstanding Your objection.

F.      The obligation to produce the documents specified below is of a continuing nature; Your production is to be supplemented if at any time You or Your agents acquire possession, custody, or control of any additional responsive documents, or otherwise discover additional responsive documents, after the time of initial production.

G.      All electronically stored information ("ESI") should be produced in native format linked to single-page tagged image file format ("TIFF"). All metadata – *i.e.,* all data describing the nature or characteristics of the electronic files, *e.g.,* "date last modified" – associated with ESI shall be produced in text format linked to the associated file. Please contact Sidley Austin LLP to further discuss the format in which ESI should be produced.

H.      These Requests may be supplemented by further requests for information and documents and other requests for disclosure.

I.      These Requests do not seek the production of any documents previously produced by Google to West Face.

## DOCUMENT REQUESTS

1.      Please produce all documents provided to Google as part of the account registration and account maintenance process for each Google Account for any Google Services, including any individual name(s), physical address, IP address, telephone number, 2-step authentication information (including any additional telephone numbers or email addresses), backup, secondary and/or auto-forwarding email addresses, birthdates, gender, and social security/social insurance number or equivalent (if available).

4

1      2.     Please produce all documents concerning Payment Information relating to a Google

2 Account for any Google Services.

3

4      3.     Please produce the IP address access log information for each Google Account for

5 any Google Services for any access, connection or login to that Google Account (each a

6 "Session"), including (i) the date, time and time zone for the initiation and disconnection / logout

7 for each Session; (ii) the originating IP address for each Session; and (iii) the user agent details for

8 each Session, including browser and version, operating system and version, and any other logged

9

10 information for each connection/session.

11      4.     Please produce all communications between Google and any user of a Google

12 Account.

13

14      5.     Please produce all Header Information for all electronic communications sent by or

15 received by a Google Account for any Google Services, and please produce any other information

16 relating to such communications that Google is not prohibited from providing under the Stored

17 Communications Act, 18 U.S.C. § 2701, *et seq.*

18

19      6.     Please produce documents concerning any user ID, identifier code or designation

20 information maintained internally by Google for a Google Account for any Google Services.

21

22      7.     Please produce documents concerning authorized applications associated with each

23 Google Account for any Google Services, including associated third-party account usernames.

24

25      8.     Please produce documents concerning information extracted, deduced or resolved

26 by Google about each Google Account for any Google Services, including all other email accounts

27 that Google believes are associated with any Google Account and information derived from

28

computers, mobile devices or other electronic access device used by a user of a Google Account or from cookies or profiling methodologies available to Google, and in particular, produce documents relating to any Google Play Store ID, Apple ID, Windows Live login ID or equivalent associated with a Google Account, and documents concerning the device(s) used by a user to access a Google Account.

9.     Please produce documents concerning any Google AdWords campaigns (or similar marketing activity) undertaken by a Google Account, including information regarding any search and display campaigns.

10.     To the extent that any Google Account is associated with any other account maintained by Google through any "fast user switching" functionality or "Sign In to Multiple Accounts At Once" functionality provided by Google, please produce all documents sought in Requests 1-9 above for those other associated accounts.



Exhibit B

AMENDED THIS  Jvly 10/18  PURSUANT TO
MODIFIÉ CE                CONFORMÉMENT À

☑ RULE/LA RÈGLE 28.02 (    A    )

☐ THE ORDER OF _____
   L'ORDONNANCE DU
DATED / FAIT LE _____

   Ray Williams ___ Ray Williams, Registrar
REGISTRAR           GREFFIER
SUPERIOR COURT OF JUSTICE   COUR SUPÉRIEURE DE JUSTICE

Commercial Court File No. CV-17-587463-00CL
Court File No. CV-17-586096

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE

B E T W E E N:

THE CATALYST CAPITAL GROUP INC. and CALLIDUS CAPITAL
CORPORATION

Plaintiffs

- and -

WEST FACE CAPITAL INC., GREGORY BOLAND, M5V ADVISORS INC.
C.O.B. ANSON GROUP CANADA, ADMIRALTY ADVISORS LLC,
FRIGATE VENTURES LP, ANSON INVESTMENTS LP, ANSON
CAPITAL LP, ANSON INVESTMENTS MASTER FUND LP, AIMF GP,
ANSON CATALYST MASTER FUND LP, ACF GP, MOEZ KASSAM,
ADAM SPEARS, SUNNY PURI, CLARITYSPRING INC., NATHAN
ANDERSON, BRUCE LANGSTAFF, ROB COPELAND, KEVIN
BAUMANN, JEFFREY MCFARLANE, DARRYL LEVITT, RICHARD
MOLYNEUX and JOHN DOES #1-10

Defendants

A N D   B E T W E E N:

WEST FACE CAPITAL INC. and GREGORY BOLAND

Plaintiffs by Counterclaim

- and -

THE CATALYST CAPITAL GROUP INC., CALLIDUS CAPITAL CORPORATION,
NEWTON GLASSMAN, GABRIEL DE ALBA, JAMES RILEY, VIRGINIA JAMIESON,
EMMANUEL ROSEN, B.C. STRATEGY LTD. d/b/a BLACK CUBE, B.C. STRATEGY
UK LTD. d/b/a BLACK CUBE, and INVOP LTD. d/b/a PSY GROUP INC.

Defendants by Counterclaim

**AMENDED AMENDED FRESH AS AMENDED
STATEMENT OF DEFENCE AND COUNTERCLAIM
OF WEST FACE CAPITAL INC. AND GREGORY BOLAND**

TO THE DEFENDANT(S) TO THE COUNTERCLAIM

A LEGAL PROCEEDING has been commenced against you by way of a counterclaim in an action in this Court. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS COUNTERCLAIM, you or an Ontario lawyer acting for you must prepare a Defence to Counterclaim in Form 27C prescribed by the *Rules of Civil Procedure*, serve it on the Plaintiff by counterclaim's lawyer or, where the Plaintiff by counterclaim does not have a lawyer, serve it on the Plaintiff by counterclaim, and file it, with proof of service, in this Court, WITHIN TWENTY DAYS after this Statement of Defence and counterclaim is served on you.

If you are not already a party to the main action and you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

If you are not already a party to the main action, instead of serving and filing a Defence to Counterclaim, you may serve and file a Notice of Intent to Defend in Form 18B prescribed by the *Rules of Civil Procedure*. This will entitle you to ten more days within which to serve and file your defence to counterclaim.

IF YOU FAIL TO DEFEND THIS COUNTERCLAIM, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date  Dec 29 2017      Issued by _____

Debbie Stubbs
Registrar

Local Registrar

Address of      Superior Court of Justice
court office:   393 University Avenue, 10th Floor
                Toronto ON M5G 1E6

330 UNIVERSITY AVENUE
7th FLOOR
TORONTO, ONTARIO
M5G 1R7

## <u>AMENDED</u> <u>AMENDED</u> FRESH AS AMENDED STATEMENT OF DEFENCE

1.      The Defendants West Face Capital Inc. ("**West Face**") and Gregory Boland ("**Boland**") deny all of the allegations in the Statement of Claim and put the Plaintiffs to the strict proof thereof.

### A.    OVERVIEW

2.      This is yet another abusive and vexatious action that the Plaintiffs, The Catalyst Capital Group Inc. ("**Catalyst**") and Callidus Capital Corporation ("**Callidus**"), have brought in bad faith. They have done so for at least three purposes:

    (a)    First, to punish, embarrass and harass West Face for its business and litigation successes at the expense of Catalyst and Callidus, by unfairly and maliciously impugning the integrity and conduct of West Face and its principals;

    (b)    Second, to distract attention from the deteriorating financial performance, overvalued assets, material non-disclosures, and misrepresentations to investors of Catalyst and Callidus; and

    (c)    Third, to intimidate West Face, Boland, other capital market participants, regulators, and members of the media, in an effort to dissuade or discourage them from scrutinizing, discussing, criticizing or commenting publicly on the deteriorating financial performance, overvalued assets, material non-disclosures, and misrepresentations of Catalyst and Callidus.

3.          This is the fourth action that Catalyst and/or Callidus have brought against West Face in the past four years. The first, the "**Moyse Action**", was dismissed by Justice Newbould after a full trial in June 2016. Justice Newbould found that Catalyst's claims and allegations against West Face were wholly lacking in merit, and made findings of credibility against all of Catalyst's principals. Justice Newbould also awarded costs of $1.2 million in favour of West Face, on a substantial indemnity basis. Justice Newbould's trial judgment and costs award were upheld by the Court of Appeal in February and March 2018, in the manner described below. The second of the Plaintiffs' actions against West Face, the "**Veritas Action**", has not been advanced by the Plaintiffs in any material respect even though it was commenced more than two and a half years ago, in June 2015.[1] The third, the "**VimpelCom Action**", was commenced on the eve of trial in the Moyse Action and was dismissed by Justice Hainey in April 2018. Justice Hainey determined that Catalyst's claim in the VimpelCom Action was barred as against various Defendants, including West Face, pursuant to the doctrines of *res judicata*, and barred as against all Defendants as an abuse of process.

4.          With respect to the Plaintiffs' claims in this proceeding, West Face and Boland have not conspired with any of the other Defendants; they never retained Bruce Livesey; they never encouraged any of the Defendants to "short" Callidus's shares; they did not participate in any "whistleblower" complaint to the Ontario Securities Commission (the "**OSC**"); and they have, in fact, not been "short" Callidus's shares since April 2015, more than two years prior to the alleged events of August 9, 2017.

---

[1]          West Face's motion to strike a portion of the claim in the Veritas Action was successful at first instance, but was ultimately dismissed by the Court of Appeal on February 1, 2017. The Plaintiffs have taken no steps to advance the Veritas Action since that time. The parties are only now proceeding to documentary discovery at West Face's insistence.

5.      Catalyst's and Callidus's claims, including in the current proceeding, have not been advanced in good faith, but instead because of West Face's business successes at Catalyst's and Callidus's expense:

(a)     West Face hired Brandon Moyse, a junior analyst, away from Catalyst in June 2014 after Moyse grew tired of Catalyst's abusive work environment and flagging deal pipeline;

(b)     Investment funds advised by West Face participated successfully in a consortium that acquired WIND Mobile ("**WIND**") in September 2014 at an enterprise value of $300 million, after Catalyst had failed to acquire WIND during a period of exclusive negotiations with the vendor in July and August 2014. West Face's consortium sold WIND a year and a half later at a $1.6 billion valuation; and

(c)     West Face successfully identified Callidus as an overvalued public company in October 2014, when Callidus's shares were trading between $20 and $25, and investment funds advised by West Face sold Callidus's shares "short". When Callidus's share price fell in early 2015, funds advised by West Face realized profits from their short positions.

6.      Catalyst's founder, CEO and Managing Partner, Newton Glassman ("**Glassman**"), reacted petulantly to all of the matters referred to immediately above. He could not tolerate being bested by West Face or Boland. As explained below, Glassman and his partners at Catalyst, including James Riley ("**Riley**") and Gabriel De Alba ("**De Alba**"), therefore decided to retaliate maliciously, including by orchestrating and

participating in a systematic and vicious campaign of defamation against West Face and Boland over the Internet, and by shrouding West Face and Boland in contention and controversy through the repeated commencement or pursuit of abusive, bad faith litigation.

7.        This action has been brought by Catalyst and Callidus for the purposes of: (i) limiting unduly and improperly expression on matters of public interest; (ii) harassing and oppressing the Defendants; and (iii) assaulting the integrity of West Face, Boland, and the administration of justice in Ontario. It should be dismissed under section 137.1 of the *Courts of Justice Act* (the **"Anti SLAPP Legislation"**), and Catalyst and Callidus should be declared vexatious litigants under section 140 of the *Courts of Justice Act*.

**B.        The Parties to the Claim**

8.        Catalyst is a Toronto-based private equity investment firm. Its three principals are Glassman, De Alba, and Riley. De Alba is a Managing Director and Partner of Catalyst. Riley is a Managing Director and Chief Operating Officer of Catalyst.

9.        Callidus is a publicly-traded company that lends money to distressed borrowers that are generally unable to access traditional lending sources. Glassman is the Executive Chairman and CEO of Callidus. Riley is Callidus's Secretary. Both are also Directors of Callidus.

10.        West Face is a Toronto-based investment management firm. It is led by its CEO, Boland.

## C.    West Face and Boland Did Not Conspire to Harm Callidus or Catalyst

11.    Contrary to the allegations in paragraphs 37 and 64 of the Claim, West Face and Boland did not participate in a conspiracy to cause the stock price of Callidus to drop, or to otherwise injure the Plaintiffs. The Plaintiffs' claims against West Face and Boland have been invented from whole cloth.

12.    West Face closed its "short" position in respect of Callidus in April 2015. Contrary to allegations made throughout the Claim, West Face has not been "short" Callidus since that time. Nor did West Face or Boland communicate with any of the other Defendants for the purpose of causing Callidus's stock price to drop.

13.    From time to time, West Face communicated with other parties that have also been sued by Catalyst or Callidus (including the Defendants Kevin Baumann, Jeffrey McFarlane, and Darryl Levitt) about: (a) the status of ongoing litigation; and (b) the businesses of Catalyst and Callidus. West Face did so in order to collect information that might be used in defending the claims that had been asserted against it by Catalyst or Callidus, and not for the purpose of any conspiracy or campaign of defamation as pleaded by Catalyst and Callidus.

14.    West Face and Boland did not conspire to disseminate negative information about Callidus through any "Bay Street rumour mill"; did not take "short" positions in Callidus during the period complained of in this proceeding; and did not participate in any "whistleblower" complaints about Callidus. Nor were West Face or Boland sources for the article about those complaints that was published in the *Wall Street Journal* on August 9, 2017 (the "**Article**"). Although West Face was asked about

possible "whistleblower" investigations by a *Wall Street Journal* reporter, it had no information to provide. West Face was at all material times aware of the litigious nature of Catalyst and Callidus, and avoided making any potentially defamatory comments in response to perfectly proper and legitimate questions of the reporter.

15.     West Face and Boland specifically deny the allegation in paragraph 65 of the Claim that the conduct alleged had "been honed through repetition in other situations". That allegation has also been invented from whole cloth. West Face and Boland have never conspired with any of the other Defendants with respect to Catalyst, Callidus or any other subject matter.

16.     Contrary to the allegations in paragraph 41 of the Claim, at no time did West Face or Boland offer to fund, or in fact fund, any of the Guarantors (as defined in the Claim) in their respective defences of claims brought against them by Callidus.

**D.     West Face and Boland Did Not Participate in a "Wolfpack Conspiracy"**

17.     Contrary to the allegations in paragraphs 56 and 76 to 93 of the Claim, West Face and Boland never retained or conspired with any of Bruce Livesey, Reuters, the *Wall Street Journal* or any other entity to write articles about Catalyst, Callidus or Glassman. Mr. Livesey is a freelance journalist who pursued independently an article concerning Glassman, Catalyst and Callidus. From time to time, Mr. Livesey contacted Boland with questions about Catalyst and Callidus and their litigation against West Face. Boland provided only publicly available information. He was fully entitled to do so.

18.     West Face did not cause or precipitate the publication by the *Wall Street Journal* of the Article complained of in the Claim concerning investigations by the OSC

and Toronto Police Services pertaining to alleged financial misconduct by Callidus, and indeed had no knowledge that such investigations were ongoing.

19.     West Face and Boland specifically deny that they had any communications with Anson or the Individual Anson Defendants (both as defined in the Claim) about any of the matters alleged in the Claim. West Face and Boland specifically deny the allegations in paragraph 59 of the Claim concerning Anson. At no time did West Face or Boland have any communications with Anson about Callidus, Catalyst or Glassman.

20.     West Face and Boland specifically deny the allegations in paragraph 60 of the Claim regarding the Defendants Clarityspring and Anderson (both as defined in the Claim). At no time did West Face or Boland encourage Clarityspring to participate in any "short attack" against or involving Callidus. Indeed, West Face and Boland were unaware of, and did not participate in, any such alleged attack, and have no knowledge of any trading activity by Clarityspring in respect of Callidus.

**E.     This Claim Is an Attempt to Limit Freedom of Expression on Matters of Public Interest**

21.     The management, conduct and performance of publicly traded companies such as Callidus, and of funds such as Catalyst that invest billions of dollars on behalf of participants in the capital markets, are matters of significant public interest. Indeed, the management and performance of Catalyst and Callidus have been the subject of widespread media coverage for years, both in the Article and elsewhere. Catalyst and Callidus seek to generate media coverage, including by frequently issuing press releases and other public statements both with respect to their performance and

concerning other matters. The Article relates to the management and performance of Callidus and, indirectly, Catalyst.

22.     One of the purposes of this action is to deter the Defendants, the media, participants in the capital markets and the public at large from scrutinizing, criticizing or commenting on the performance and conduct of Callidus and Catalyst. By suing for conspiracy as well as defamation, Callidus and Catalyst have attempted to deter actual or potential critics from even discussing them in private lest they too be accused of participating in an unlawful "wolfpack conspiracy".

23.     Catalyst's and Callidus's pattern of engaging in bad faith and abusive litigation and other unlawful and offensive conduct aimed at suppressing free speech and criticism is further demonstrated by their conduct in respect of the Defendant Bruce Langstaff. Mr. Langstaff, formerly an equity salesperson at Canaccord Capital Corporation ("**Canaccord**"), investigated the financial performance of Callidus. He was fully entitled to do so. Nevertheless, Riley retaliated against Langstaff by demanding that Canaccord fire Mr. Langstaff. He did so with a view to sending a clear and unmistakable message to Mr. Langstaff, Canaccord and other participants in the capital markets that none of Catalyst, Callidus, or their principals would tolerate investigations of this nature that might bring to light questionable or improper conduct that Catalyst or Callidus had engaged in. Canaccord acceded to Riley's demand and fired Mr. Langstaff in order to placate Catalyst, Callidus, and their principals.

24.     West Face and Boland request that this action be dismissed against them with costs on a full indemnity or solicitor and his own client basis.

## AMENDED AMENDED FRESH AS AMENDED COUNTERCLAIM

25.     The Plaintiffs by Counterclaim, West Face and Boland, counterclaim against the Defendants by Counterclaim, Catalyst, Callidus, Glassman, De Alba, Riley (collectively, the "**Catalyst Defendants**"); Virginia Jamieson ("**Jamieson**"), Emmanuel Rosen ("**Rosen**"), B.C. Strategy Ltd., B.C. Strategy UK Ltd. (together with B.C. Strategy Ltd., "**Black Cube**"), and Invop Ltd., doing business as Psy Group Inc., the operating name of Invop Ltd., ("**Psy Group**") (the Catalyst Defendants, Jamieson, Rosen, Black Cube, and Psy Group, collectively, the "**Counterclaim Defendants**") for:

(a)     A declaration that the Counterclaim Defendants have defamed West Face and Boland;

(b)     General damages in the amount of $450 million for West Face and $50 million for Boland, for defamation, conspiracy, breach of confidence, inducing breach of confidence, inducing breach of contract, inducing breach of fiduciary duty, and the tort of unlawful means;

(c)     A declaration that Glassman, De Alba, and Riley are personally liable for their unlawful actions carried out by, through or in the name of Catalyst, Callidus, the other Counterclaim Defendants, and/or any other corporation, entity, representative or agent through which he or they participated or engaged in wrongdoing as pleaded in this Counterclaim;

(d)     A declaration that the Counterclaim Defendants are jointly and severally liable to West Face and Boland for all loss, harm or damage caused by or as a result of the conspiracy complained of herein;

(e)     An Order requiring the Counterclaim Defendants to deliver up to West Face all originals and copies of all recordings, transcripts, notes, memoranda, emails, text messages or other physical or electronic documents in their possession, control or power (including, without limitation, in the possession of their counsel or other agents) that contain, summarize or reflect the contents of stings conducted by operatives of Black Cube or other investigative firms or agencies involving current or former employees of West Face, or Justice Newbould, and requiring them to certify under oath that they have done so;

(f)     A declaration under section 140 of the *Courts of Justice Act* that the Catalyst Defendants are vexatious litigants and an Order that: (i) no further proceeding may be instituted by the Catalyst Defendants or any subset of them in any court against West Face or its officers, directors, or employees; and that (ii) proceedings previously instituted by the Catalyst Defendants or any subset of them against West Face or its officers, directors, or employees may not be continued, except by leave of a judge of the Superior Court of Justice;

(g)     To the extent necessary, an Order permitting West Face and Boland to seek the declaration and relief referred to immediately above in this proceeding, rather than by way of separate Application;

(h)     In the alternative, requiring that any such Application that may be required, be heard and determined at the same time, in the same hearing and by

the same Justice of this Court that presides at the trial of this Counterclaim;

(i) Punitive damages in the amount of $45 million for West Face and $5 million in aggravated and punitive damages for Boland;

(j) Compound pre-judgment and post-judgment interest, in amounts and at rates to be determined by the Court;

(k) In the alternative, pre-judgment and post-judgment interest in accordance with sections 128 and 129 of the *Courts of Justice Act*, as amended;

(l) The costs of this proceeding on a full indemnity or solicitor and his own client basis; and

(m) Such further and other relief as this Honourable Court may deem just.

## A.    OVERVIEW

26.    This Counterclaim arises out of an insidious, co-ordinated, and systematic campaign of defamation and economic interference that the Counterclaim Defendants have pursued against West Face and Boland in retaliation for at least two series of events that the Catalyst Defendants took umbrage with:

(a) **The WIND Transaction**: In September 2014, investment funds managed by West Face participated in a consortium of investors that successfully acquired Canadian wireless telecommunications company WIND, after Catalyst failed in its attempts to do so. West Face's consortium sold WIND a year and a half later to Shaw Communications for more than five times

what they paid to acquire it. Catalyst responded by suing West Face in the Moyse Action for more than $500 million,[2] and in doing so alleged falsely that West Face had acted improperly and unlawfully by "scooping" the WIND deal from Catalyst through the misuse of confidential information of Catalyst that was purportedly obtained by West Face from a former junior analyst of Catalyst named Brandon Moyse. After a full trial on the merits, Justice Newbould of the Commercial List rejected completely all of Catalyst's claims. Justice Newbould held that West Face did not receive from Moyse any of Catalyst's confidential information concerning WIND. He also held that Catalyst had failed to acquire WIND because of its own intransigence, miscalculations and other failings, and that Catalyst's strategy to acquire WIND could never have succeeded in any event. Justice Newbould made adverse findings of credibility against each of Glassman, De Alba, and Riley, criticized Catalyst for baselessly attacking the integrity of West Face and its principals, including Boland, and awarded West Face substantial indemnity costs in the amount of $1.2 million. Catalyst's appeal from Justice Newbould's trial judgment in the Moyse Action was dismissed on its merits by the Ontario Court of Appeal on February 21, 2018, from the bench, without the need for oral submissions from West Face or Moyse. Catalyst's motion for leave to appeal to the Court of Appeal in respect of the award of substantial indemnity costs made in favour of West Face by Justice Newbould was

---

[2] The Moyse Action claimed damages of $500 million. The subsequent VimpelCom Action, which also claimed damages for West Face's participation in the acquisition of WIND, claimed $1.3 billion.

dismissed by that Court in written reasons released on March 22, 2018; and

(b)     **The Callidus "Short"**: In the Fall of 2014, Callidus's shares were trading at over $20 per share. West Face correctly identified Callidus as an overvalued company, sold Callidus's shares "short", and made a profit in the Spring of 2015 when Callidus's shares fell to under $17 per share (at which time West Face closed out its "short" position). Approximately two-thirds of Callidus's shares were (and continue to be) held by funds managed by Catalyst. As a result, this decline in share price caused by Callidus's weak financial condition was harmful not only to Callidus, but also to Catalyst and its funds. Callidus's share price has continued to fall since that time as a result of Callidus's poor financial performance, and its shares currently trade at under $7 per share.

27.     The Catalyst Defendants, and in particular Glassman (who was the self-proclaimed "architect" of Catalyst's failed strategy to acquire WIND) refused to accept responsibility for these failures. Instead, Glassman and the other Catalyst Defendants blamed West Face and Boland for the woes suffered by Catalyst and Callidus, and decided to retaliate in an effort to shroud West Face and Boland in contention and controversy. They were well aware, and indeed intended, that doing so would deter investors and other participants in the capital markets from doing business with West Face and Boland, thereby causing them harm. That is precisely what has happened. The Catalyst Defendants and other Counterclaim Defendants acted with malice, and with contumelious disregard for the rights and interests of West Face and Boland, in

orchestrating the campaign of defamation and harassment described below. They sought to inflict as much harm as possible on West Face and Boland by engaging in the conduct at issue in this Counterclaim, including by disseminating their false and defamatory statements concerning West Face and Boland not only to investors in or with Callidus and Catalyst, but also to current and potential investors with West Face and Boland. The Catalyst Defendants and other Counterclaim Defendants conspired together and with one another to defame and interfere with the economic interests of West Face and Boland in order to punish, embarrass, discredit and harm them, and to deter them and others from crossing the Catalyst Defendants.

28.        This conspiracy was also intended to divert the attention of investors, and the financial community at large, from the Catalyst Defendants' own failures, as well as from allegations of misconduct and "whistleblower" complaints made against Callidus and other Catalyst Defendants (including Glassman and Riley) by parties unrelated to West Face.

29.        The conspiracy was hatched in or about August 2017 in response to a series of setbacks for the Catalyst Defendants. First, Catalyst had lost the Moyse Action at trial, as described above. Catalyst's appeal from Justice Newbould's trial decision in the Moyse Action was scheduled to be heard by the Court of Appeal on September 26 and 27, 2017, and Catalyst and its principals were well aware that Catalyst had no reasonable possibility of success on appeal.

30.        Second, in the period from August 16 to 18, 2017, the parties to the VimpelCom Action argued before Justice Hainey motions brought by the Defendants to

strike out, stay or dismiss that Action, on the basis that it was precluded by the doctrines of *res judicata* and abuse of process. Catalyst's claims again West Face and other Defendants in the VimpelCom Action overlapped substantially with claims asserted by Catalyst against West Face in the Moyse Action, and concerned the acquisition by West Face and other investors of WIND in September 2014. The motions of the Defendants to stay or dismiss the VimpelCom Action were based, in part, on issues that had been determined and findings of fact that had been made by Justice Newbould at trial in the Moyse Action. At Catalyst's request, Justice Hainey reserved releasing his decision concerning those motions until after the Court of Appeal had heard and decided Catalyst's appeal in the Moyse Action, on the basis that findings made by Justice Newbould at trial in the Moyse Actin might be disturbed on appeal. Catalyst and its principals were well aware that if Catalyst's appeal in the Moyse Action failed and key findings made against it by Justice Newbould in the Moyse Action were not interfered with by the Court of Appeal, it had no reasonable prospect of surviving the Defendants' motions to stay or dismiss the VimpelCom Action. In short, as of August 2017, Catalyst's litigation strategy with respect to its claims concerning the WIND transaction was rapidly failing. Catalyst, however, had represented to its investors (including in presentation materials distributed in connection with its Annual Meeting of Limited Partners in the Spring of 2017) that its claims in the Moyse Action and the VimpelCom Action were worth at least $450 million. In late August 2017, Catalyst faced the likelihood of both of these Actions being stayed or dismissed in the very near future.

31.     Third, on August 9, 2017, the *Wall Street Journal* published the Article that forms the basis of Catalyst's Claim in this Action, describing in detail various

"whistleblower" complaints that had been made against Callidus and other Catalyst Defendants, including to the OSC.

32. In response to these developments, in or about August 2017, the Catalyst Defendants decided that, having been unable to succeed in business or litigation against West Face, they would seek to punish, embarrass and discredit West Face and Boland as West Face's principal, in an effort to shroud them in contention and controversy. In order to carry out this plan, they conspired together with the other Counterclaim Defendants to harm the reputations and business interests of West Face and Boland, including by discrediting Justice Newbould and undermining the validity of the Decision he had rendered in favour of West Face in the Moyse Action. West Face and Boland were the ultimate targets of the deplorable attack that the Counterclaim Defendants waged against Justice Newbould, as described hereafter. Among other things, the Catalyst Defendants hoped to be able to use "evidence" concerning Justice Newbould that had been or was about to be obtained improperly, unethically and illegally by the other Counterclaim Defendants to undermine the position of West Face in Catalyst's appeal to the Court of Appeal in the Moyse Action, as well as West Face's position in the motions pending in the VimpelCom Action. They also intended to use that "evidence" to attack West Face and Boland in their communications with investors, with other participants in the financial markets, and with members of the media. Justice Newbould was an innocent victim in their pernicious scheme.

33. The conspiracy of the Counterclaim Defendants against West Face and Boland fell into two broad categories:

(a) **The Black Cube Campaign**: The Catalyst Defendants retained or caused to be retained Black Cube, a private investigative firm staffed with former Mossad and Israeli Defence Force intelligence operatives, to conduct a series of "stings" against current and former West Face employees, and against Justice Newbould. The purpose and effect of these stings was to elicit by unlawful means confidential and privileged information of West Face, to attack unfairly the honour, integrity and conduct of Justice Newbould and to discredit and embarrass West Face, Boland, and other enemies of Catalyst, Callidus and their principals, either real or perceived. The Catalyst Defendants and other Counterclaim Defendants also conspired to use the fruits of the Black Cube Campaign for the express and predominant purpose of harming and embarrassing both West Face and Boland; and

(b) **The Defamation Campaign**: The Catalyst Defendants, Jamieson, Rosen, Black Cube, and Psy Group conspired to defame West Face and Boland in three principal respects:

    (i) **The WIND Defamation**: They repeatedly and falsely accused West Face and its principals, including Boland, of acquiring West Face's interest in WIND by unlawful means, including by misusing confidential information of Catalyst obtained improperly by West Face from Moyse;

    (ii) **The Wolfpack Defamation**: They repeatedly and falsely accused West Face and its principals, including Boland, of engaging in improper conduct including by conspiring with others as part of a "wolfpack" of conspirators, to manipulate illegally the share price of Callidus and other companies related to Catalyst; and

(iii) **The Performance Defamation**: They repeatedly defamed West Face and its principals, including Boland, by impugning unfairly the performance of West Face's funds and alleging falsely that West Face and its principals, including Boland, had engaged in misconduct, including the improper manipulation of investors and regulators.

34.     The unlawful conspiracy of the Counterclaim Defendants was carried out in at least five ways:

(a)     By issuing or disseminating false and defamatory press releases and other statements about West Face and its principals, including Boland, to current and potential investors with West Face as well as others;

(b)     By making false and defamatory statements about West Face and its principals, including Boland, to various members of the financial community, including to current and potential investors with West Face, and encouraging parties not to invest in, or to withdraw monies from, funds managed by West Face;

(c)     By making false and defamatory statements about West Face and its principals, including Boland, through communications to Catalyst's funds, limited partners, and/or investors. Given that Catalyst and West Face are competitors, all of Catalyst's investors are potential investors in funds managed by West Face;

(d)     By harassing and intimidating, or retaining third parties, including Black Cube, to harass and, intimidate both Boland and West Face, by: (i) attempting to solicit unlawfully confidential and privileged information about West Face and Boland from current and former employees of West

Face, in breach of their professional and contractual obligations; (ii) attempting to attack the honour, integrity and conduct of Justice Newbould because of his Decision against Catalyst in the Moyse Action and with the goal of fabricating supposed "fresh evidence" that could be used against West Face both during Catalyst's appeal to the Court of Appeal from that Decision and in the VimpelCom Action, and in attacks against West Face and its principals, including Boland, over the Internet; and (iii) providing edited or altered transcripts of surreptitiously recorded meetings between operatives of Black Cube and their targets to various journalists, including at Bloomberg News and the Associated Press, in an attempt to cause the publication of false and defamatory articles concerning West Face and its principals, including Boland. Meetings and discussions between operatives of Black Cube, current and former employees of West Face and Justice Newbould were arranged, orchestrated and conducted through the use of false pretences, deceit and false promises of employment, engagement or investment; and

(e) By obtaining and utilizing information gathered or manufactured by Jamieson, Rosen, Black Cube, Psy Group and others retained or engaged by or on behalf of them or the Catalyst Defendants, to publish and disseminate as broadly as possible a series of vicious, false and defamatory statements about West Face and Boland, including over the Internet, using fictional or misleading usernames (including "Judge Frank

Newbould") and by employing various other techniques to conceal who was actually responsible for the dissemination of these statements.

35.        All of the foregoing activities were carried out in bad faith, and with the intent of retaliating against and punishing, embarrassing, discrediting and harming West Face and Boland, and not for any valid or proper purpose. The predominant purpose of .the Catalyst Defendants and their co-conspirators was to injure West Face and Boland, and they succeeded in achieving their objective. The conspirators also utilized unlawful means in carrying out their agreed upon campaign of vilification, defamation and harassment, as described below, in circumstances where they were well aware that West Face and Boland would suffer harm as a direct result of their improper conduct. Harm did, in fact, result both to West Face and to Boland as described below.

### B.        The Parties to the Counterclaim

36.        The parties to the Counterclaim include the Plaintiffs by Counterclaim, West Face and Boland, as well as the Catalyst Defendants: Catalyst, Callidus, Glassman, De Alba, and Riley. These parties are described above in the Statement of Defence of West Face and Boland.

37.        Glassman, Riley, and De Alba participated personally in the acts of misconduct pleaded and relied upon by West Face and Boland. Their conduct was itself tortious, and went well beyond the scope of any duties that may properly have been owed by them to Catalyst or Callidus. Indeed, these individuals acted throughout in a spiteful, vindictive, and abusive fashion that no responsible public company, or any company charged with the important responsibility of managing and investing the funds

of others, could properly have authorized, sanctioned, or tolerated. They are personally liable to West Face and Boland for their misconduct.

38.     Glassman, Riley, and De Alba used the names, positions and resources of Catalyst and Callidus in engaging in the misconduct complained of herein. In the circumstances, Catalyst and Callidus are also liable to West Face and Boland for this misconduct.

39.     In addition to the Catalyst Defendants, the Counterclaim Defendants include the Defendants described below.

40.     Jamieson is an individual residing in Brooklyn, New York. Jamieson is a communications professional with broad experience in public relations, technology and social media. She conspired with the Catalyst Defendants to write, publish, and/or cause the publication and dissemination of false and defamatory statements concerning West Face, Boland and Justice Newbould. Her role in the conspiracy referred to herein included a failed attempt to induce Christie Blatchford ("**Blatchford**"), a prominent, highly respected and widely read journalist at the *National Post*, to publish false and defamatory articles about West Face, Boland and Justice Newbould, including both before and after Catalyst's appeal to the Court of Appeal from the Decision of Justice Newbould in the Moyse Action was originally scheduled to be heard on September 26 and 27, 2017. Jamieson also retained or caused to be retained other third parties located around the globe, to write, publish and disseminate false and defamatory statements about West Face, Boland and Justice Newbould, while using false aliases and usernames to keep her real identity and involvement secret.

41.     As stated above, Black Cube is an investigative firm comprised of former members of the Israeli Defence Force and the Mossad, Israel's national intelligence agency. Black Cube was retained by or on behalf of the Catalyst Defendants, directly or indirectly, to elicit confidential and privileged information of West Face from its current and former employees, business contacts and their family members, as well as to obtain information that could be used to discredit Justice Newbould and his Decision in favour of West Face in the Moyse Action. The ultimate targets of all of the activities undertaken by Black Cube in respect of this matter were West Face and Boland. Black Cube has offices in Tel-Aviv, London and Paris. Black Cube operates through various corporate entities, including B.C. Strategy Ltd., an Israel-based company, with company number 514587591, and B.C. Strategy UK Ltd., an UK-based company. Neither Black Cube entity nor any of Black Cube's individual operatives were licensed private investigators in Ontario during the relevant period in which Black Cube perpetrated the various "sting" operations described below in furtherance of the conspiracy.

42.     Rosen is an individual residing in Israel. His personal identification number in Israel is 56548456. Rosen is a former TV journalist and documentary filmmaker. Like Jamieson, Rosen was retained by the Catalyst Defendants, directly or indirectly, to write, publish and/or cause the publication and dissemination of false and defamatory statements about West Face, Boland and Justice Newbould. He was also involved in a failed attempt to induce Blatchford to publish false and defamatory articles about West Face, Boland, and Justice Newbould.

43.     Psy Group is an intelligence services company based in Limassol, Cyprus, with numerous operatives working out of Petah Tikva, in the metropolitan area of Tel

Aviv. Psy Group is the operating name of Invop Ltd., whose company number in Israel is 51-517203-9. Psy Group was retained by or on behalf of the Catalyst Defendants, directly or indirectly, to assist the Catalyst Defendants in orchestrating and implementing their systematic campaign of defamation against West Face and Boland.

**C.  Background to the WIND Defamation: Catalyst's Failure to Acquire WIND**

44.      To understand why statements and allegations made and published by or on behalf of the Counterclaim Defendants about West Face and Boland relating to WIND are false and defamatory to West Face and Boland, as well as why and how the Counterclaim Defendants acted with malice in making, disseminating or causing to be made or disseminated the statements and allegations in question, it is necessary to understand why and how Catalyst actually failed to acquire WIND. This sequence of events is one of the principal reasons why the Catalyst Defendants initiated, orchestrated and implemented their unlawful conspiracy, as described herein, and acted with malice in doing so.

45.      The question of why Catalyst failed to acquire WIND was decided by Justice Newbould in his Reasons for Judgment dated August 18, 2016 in the Moyse Action. As stated above, Catalyst's appeal from the trial judgment of Justice Newbould was dismissed by the Court of Appeal from the bench on February 21, 2018, with written reasons released on March 22, 2018 (which also dismissed Catalyst's motion for leave to appeal from Justice Newbould's award of costs).

46.      In January 2014, Moyse contacted West Face to seek employment. Moyse had applied for a job at West Face two years earlier, but decided at that time to

work at Catalyst. After a series of interviews, in May 2014 West Face extended a job offer to Moyse, who was at that time working at Catalyst as a junior analyst. Moyse accepted West Face's offer of employment, and tendered his resignation to Catalyst.

47.     In June 2014, Catalyst commenced the Moyse Action against Moyse and West Face, alleging that Moyse had breached the confidentiality and non-competition provisions in his employment contract with Catalyst. In its initial Statement of Claim, Catalyst did not specify what confidential information Moyse had allegedly communicated to West Face.

48.     In September 2014, a consortium of investors that included West Face acquired WIND after Catalyst failed to do so. Shortly thereafter, in October 2014, Catalyst amended its Claim in the Moyse Action to assert that West Face had acquired WIND by misusing confidential information belonging to Catalyst that West Face had allegedly solicited and obtained from Moyse. Those allegations were demonstrably false.

49.     The trial of the Moyse Action was heard by Justice Newbould over seven extended days of hearings in June 2016. Multiple witnesses testified that Moyse did not convey to West Face at any time confidential information of Catalyst concerning WIND. Catalyst failed utterly in its efforts to adduce evidence to the contrary. On August 18, 2016, Justice Newbould released his Reasons for Judgment dismissing Catalyst's claims against West Face and Moyse in their entirety. West Face relies on the doctrines of *res judicata* and abuse of process with respect to the following facts found by Justice Newbould.

50.     Due to regulatory restrictions on foreign ownership of Canadian telecommunications companies that existed at the time, Globalive Capital, a Canadian entity, held two-thirds of the voting shares of WIND but only one-third of the total equity. VimpelCom, a Dutch-headquartered but Russian-controlled company, held one-third of the voting shares and two-thirds of the total equity.

51.     Over time, VimpelCom had become frustrated by the regulatory hurdles it faced in Canada. This frustration drove its decision to divest its ownership of WIND. VimpelCom's desire to sell its interest in WIND was well-publicized in 2014. VimpelCom made widely known that it was seeking to sell its interests in WIND based on an enterprise value of only $300 million, which was substantially less than the amount VimpelCom had invested in WIND.

52.     West Face and Catalyst both carried on discussions and negotiations with VimpelCom and its advisors in the first half of 2014. During this period, VimpelCom made clear to interested bidders that speed and certainty of closing were its highest priorities. Bidders were not competing on price, which was non-negotiable and had been fixed and made widely known by VimpelCom.

53.     Ultimately, VimpelCom entered into an exclusivity agreement with Catalyst on July 23, 2014. As a result, VimpelCom was forbidden from negotiating with West Face or any other bidder during the term of the exclusivity agreement. While the term of VimpelCom's exclusivity agreement with Catalyst was extended several times, ultimately it expired on August 18, 2014.

54.     During this period of exclusivity, Catalyst came close to concluding an agreement with VimpelCom to acquire WIND, but failed to do so because of its own flawed assessment of WIND's business as well as its intransigent bargaining position.

55.     Specifically, Catalyst believed that WIND would not be a viable business without an express guarantee, in the form of a significant "regulatory concession", from the Government of Canada that would have permitted Catalyst to sell or transfer WIND or its wireless spectrum to one of Canada's incumbent wireless carriers (Rogers, Bell and Telus) after five years. For this reason, and as noted by Justice Newbould in his Reasons for Judgment, "Catalyst had no intention of closing a deal with VimpelCom if it could not obtain the concessions it was looking for from the Government".

56.     Unfortunately for Catalyst, the Government of Canada's well established regulatory policy was to encourage the growth and development of a fourth national wireless carrier. Indeed, that had been the Government's explicitly stated policy for years, dating back to at least 2008. As a result, WIND was expressly forbidden by the Government from selling its wireless spectrum to an incumbent. Despite Catalyst's repeated efforts throughout the Spring and Summer of 2014, the Government of Canada steadfastly refused to grant regulatory concessions to Catalyst that would have guaranteed Catalyst the ability to sell or transfer WIND or its spectrum to an incumbent after five years. Indeed, the Government was unequivocal that no such concession would be granted to Catalyst.

57.     Catalyst hoped that if it was able to complete and execute an agreement to acquire WIND from VimpelCom and Globalive Capital, the Government of Canada

would yield to Catalyst's demands rather than risk the negative publicity that might have arisen if Catalyst's efforts to acquire WIND were terminated.

58.　　　　VimpelCom, however, was unwilling to permit Catalyst to even speak with the Government concerning potential regulatory concessions in the interim period between entering into an agreement for the sale of WIND and the closing of the sale transaction. VimpelCom was concerned that any such discussions could delay or jeopardize the grant by the Government of regulatory approval for the transaction, which was required before any transfer of voting control of WIND could be completed. In its negotiations with Catalyst (and West Face) throughout 2014, VimpelCom had emphasized its desire for a "clean exit" from WIND with minimal regulatory risk.

59.　　　　VimpelCom therefore negotiated for and obtained an agreed-upon clause in its proposed agreement with Catalyst that expressly precluded Catalyst from discussing the regulatory concession referred to above with the Government of Canada in the interim period between signing and closing. This meant that for Catalyst to carry out its intended strategy of seeking regulatory concessions about the sale of WIND or its spectrum to an incumbent once it signed its proposed agreement with VimpelCom, Catalyst would have had to breach the very agreement it had just signed. This was a fatal flaw that lay at the heart of Catalyst's seriously flawed acquisition strategy, and had nothing to do with West Face.

60.　　　　In early August 2014, the chief negotiators for Catalyst and VimpelCom agreed on a draft form of Share Purchase Agreement. However, VimpelCom's Board of Directors had to approve the transaction before it could proceed. VimpelCom's Board

was dissatisfied that the proposed form of Share Purchase Agreement offered VimpelCom inadequate protection in respect of amounts VimpelCom anticipated having to spend to fund the operations of WIND in the interim period between signing and closing. Closing could not occur until the necessary regulatory approvals had been obtained.

61.     To address this concern, in mid-August 2014, VimpelCom asked Catalyst to agree to pay a break fee of between $5 and $20 million in the event that the Government of Canada did not approve the sale of WIND to Catalyst within two months. The amount of the break fee was intended to represent funding that VimpelCom would have to provide to WIND during the interim period between signing and closing.

62.     Catalyst refused to accede to, or even to discuss, VimpelCom's request for a break fee. Believing incorrectly that VimpelCom had no other viable options, on or about August 15, 2014, Catalyst terminated its discussions and negotiations with VimpelCom, let its period of exclusivity expire, and encouraged VimpelCom to consider its alternatives.

63.     Catalyst's belief was misplaced. VimpelCom did, in fact, have other options. On August 6, 2014, a consortium that included West Face had submitted an unsolicited offer for WIND to VimpelCom that did not require regulatory concessions, and was structured in such a way as to avoid entirely the need for regulatory approval before VimpelCom's interest in WIND could be conveyed. Unlike Catalyst, the consortium was willing to acquire initially only VimpelCom's interest in WIND, leaving Globalive's voting control in place. The acquisition of VimpelCom's interest in WIND did

not constitute a change of control of WIND. Absent a change of control, no regulatory approval was necessary to complete the sale of VimpelCom's interest.

64.     While VimpelCom conducted no negotiations with West Face or other members of its consortium during Catalyst's period of exclusivity, once Catalyst's right to exclusivity expired, VimpelCom was permitted to and did in fact engage in negotiations with members of the consortium. Those negotiations concluded successfully with the consortium's acquisition of VimpelCom's interest in WIND on September 16, 2014.

65.     As found by Justice Newbould, the consortium's unsolicited offer of August 6, 2014 did not cause Catalyst's failure to acquire WIND. Rather, Catalyst failed to complete its proposed Agreement with VimpelCom for two reasons. First, because of its intransigence in refusing to agree to, or even to discuss, VimpelCom's request for a modest break fee of only $5 to $20 million. Second, Catalyst could never have successfully completed its proposed acquisition of WIND because it was unable to obtain regulatory concessions from the Government of Canada permitting it to sell WIND or its spectrum to an incumbent after five years, which Catalyst believed to be a necessary pre-condition to the completion of the proposed acquisition.

66.     As described below, the WIND Defamation was rooted in: (i) the refusal of the Catalyst Defendants to accept these facts as described above and found by Justice Newbould; and (ii) the insistence of the Catalyst Defendants in relying upon their entirely false claim that West Face had instead "scooped" or stolen WIND by misusing

confidential information of Catalyst concerning WIND that was allegedly conveyed to West Face by Moyse.

**D.    Background to the Callidus Defamation: Callidus Was Overvalued**

67.         To understand why the various statements and allegations of the Counterclaim Defendants relating to Callidus are false and defamatory to West Face and Boland, as well as why and how the Counterclaim Defendants acted with malice in making, disseminating, or causing to be made or disseminated the statements and allegations in question, it is necessary to understand what the Catalyst Defendants allege West Face has done. This sequence of events is another principal reason why the Catalyst Defendants initiated, orchestrated and implemented their unlawful conspiracy, as described herein, and acted with malice in doing so.

68.         Callidus holds itself out as an alternative business lender. Callidus makes business loans with limited or no financial covenants, purports to secure its loans against the most liquid assets of its borrowers, and claims to charge extraordinary interest rates in the range of 18 to 20%. Callidus can properly be described as a "lender of last resort", as its borrowers would not pay the high interest rates and fees charged by Callidus if more traditional (and less expensive) forms of debt financing were available to them. As a result, Callidus's borrowers are often in, or on the verge of, some form of financial distress or difficulty.

69.         Callidus was wholly-owned by funds managed by Catalyst until April 2014, when Callidus conducted an initial public offering ("**IPO**") of a portion of its shares. The

   - 32 -

IPO resulted in the ownership interest held by Catalyst's funds being reduced from 100% to approximately 66%.

70.     Callidus offered a portion of its shares to the public in its IPO at $14 per share. However, almost immediately after its IPO, Callidus's share price began to rise. By mid-August 2014, its shares were trading at over $20 per share—a significant premium to their IPO price and an even greater premium to their book value based on the assets and liabilities reported in Callidus's public disclosure.

71.     West Face monitored Callidus's share price in the period since its IPO. By October 2014, West Face believed that the significant premium of Callidus's share price over its book value was unwarranted. It appeared to West Face that the gap between Callidus's book value and the trading price of its shares indicated that the market perceived significant intangible value in Callidus's continuing ability to generate an ever-expanding portfolio of high yield loans that would not default or otherwise suffer from an impairment of their value. West Face believed that this was unsustainable for a number of reasons.[3]

72.     Accordingly, in late October 2014, West Face made a reasoned and entirely appropriate investment decision to begin short-selling Callidus's shares. Around the same time, West Face began conducting more detailed research into the underlying business carried on by Callidus. West Face began summarizing this research and analysis in a proprietary, internal working document.

---

[3]     West Face's reasons for believing that Callidus's share price was overvalued are set out in detail in West Face's Statement of Defence in the Veritas Action.

73.        West Face's research into Callidus was conducted on its own account, and for its own internal purposes. In conducting its research, West Face used public sources, such as law firm websites; accounting firm websites (particularly of firms acting as the Monitor or Trustee of insolvent Callidus borrowers); the website of the Office of the Superintendent of Bankruptcy in Canada; case dockets of ongoing bankruptcy proceedings; and public registries of security interest registrations maintained by various government agencies in Canada and the United States, and investment research prepared by investment banks.

74.        West Face's research revealed significant issues with a number of the loans Callidus had made to troubled borrowers, and validated West Face's thesis that Callidus's share price was overvalued. Among other things, West Face determined by December 2014 that:

(a)        Callidus's loan portfolio was highly concentrated, in that it contained a relatively small number of outstanding loans;

(b)        A number of borrowers of these outstanding loans were in restructuring, bankruptcy or other court proceedings, with little obvious means of repaying sums owed to Callidus, and where collateral valuations would be tested;

(c)        Callidus's portfolio of outstanding loans also included a number of specific problem loans that had undisclosed indicators of material impairment;

(d)        The valuations Callidus had attached to collateral supporting these loans were overstated;

(e)    There was unexplained dramatic growth in the gross book value Callidus had reported in respect of several problem loans, suggesting that additional credit had been extended to borrowers to keep loans from defaulting;

(f)    Callidus had made loans to borrowers without conducting sufficient due diligence as to the strength of the loan collateral when loans were made;

(g)    Contrary to Callidus's assertions that it only made loans against its borrowers' most liquid assets, Callidus had made loans that were secured against illiquid collateral, such as undeveloped resource property; and

(h)    Callidus appeared to be unable to expand its loan portfolio to the degree necessary to justify the premium investors had attached to its publicly traded shares without incurring additional loan losses, or charging lower rates of interest.

75.    West Face identified these significant concerns despite the fact that, as of November 2014, Callidus had represented publicly that every single one of its loans was current in all interest and principal obligations, that its loans were more than 100% collateralized, and that Callidus had suffered no realized loan losses in spite of lending exclusively to financially troubled borrowers that could not access traditional sources of lending.

76.    In sum, West Face had good reason to continue accumulating a "short" position in Callidus throughout the Fall of 2014. West Face ceased accumulating this

"short" position in Callidus on December 24, 2014. By that time, Callidus's share price had dropped to approximately $18 per share (which was still well above the book value per share).

77.     West Face closed out its "short" position in Callidus in the Spring of 2015, when Callidus's shares were trading at approximately $13 to $17 per share. As set out in West Face's Statement of Defence, West Face has not "shorted" Callidus's shares in the period since, for approximately three years, and had no involvement in any alleged "short attack" of August 9, 2017, which is complained of in the Claim of Catalyst and Callidus.

78.     In June 2015, Catalyst commenced the Veritas Action against West Face. In the Veritas Action, Catalyst and Callidus accused West Face and Veritas Investment Research Corporation ("**Veritas**") of engaging in a conspiracy to defame Catalyst and Callidus so that West Face could profit from a short-selling strategy in Callidus's shares. As described above, West Face did, in fact, short-sell Callidus's shares in the Fall of 2014. However, West Face did so because it determined that Callidus's shares were overvalued at the time. Moreover, West Face did not engage in a conspiracy with Veritas to publish false or defamatory statements about Callidus.

79.     Events since the Fall of 2014 have only served to validate the concerns that West Face identified with Callidus when it took its "short" position at that time. For example, Callidus's loans to Xchange Technology, the Arthon Group, Leader Energy, North American Tungsten, Esco Marine, Deepak International, Harvey Industries (now Wabash Industries), Bluberi Gaming Technologies, Groupe Arsenault, Alken Basin

Drilling, Gray Aqua, C&C Wood Products, Otto Industries, Fortress Resources, Binder Machinery, Midwest Asphalt Corporation and Horizontal Well Drillers (to name a few), totalling over $950 million in principal, interest and fees owing, have all developed material indicators of significant impairment or have been subject to insolvency proceedings.

80.        Xchange Technology is one of the more significant problematic Callidus loans identified by West Face in 2014. Callidus advanced a one year loan of $22 million to Xchange Technology in October 2012. In February and May 2013, before maturity of the loan, Xchange Technology ran two separate capital raising processes in an attempt to refinance the Callidus loan. Both processes failed. In October 2013, Callidus commenced a successful receivership application appointing Duff & Phelps as receiver and approving a "stalking horse" sales process for the sale of substantially all of Xchange Technology's business and assets. Callidus served as the stalking horse and "credit bid" on Xchange Technology in November 2013. At the time, Callidus was owed approximately $38 million.

81.        The credit bid did not close until November 2015 and by December 31, 2015, Callidus's financial statements listed the acquired business as an asset held for sale with a value of $66.8 million. In a decision issued on May 31, 2016, in proceedings between Callidus and the defendant Jeffrey McFarlane, the former President and CEO of Xchange Technology, Justice Newbould held that the basis for the $66.8 million figure in Callidus's financial statements was "not at all clear".

82.     Ultimately, in or around the first quarter of 2016, funds managed by Catalyst purchased Xchange Technology from Callidus for $101.3 million, which Callidus indicated was the "total outstanding principal plus accrued and unpaid interest". Callidus primarily used the proceeds it received from funds managed by Catalyst to repay a portion of the balance outstanding to Catalyst from Callidus under a subordinated bridge facility. No funds were recovered from an independent third party. Catalyst now carries Xchange Technology's assets at only 20% of cost.

83.     As a result of these and other issues, since 2015, Callidus has incurred significant loan loss provisions, negatively affecting its financial condition. Similarly, Callidus's financial difficulties have inhibited its ability to initiate new loans, leading to a material overall reduction of its loan book. This reduction in the size of Callidus's loan book has reduced the company's book value and put downward pressure on its share price valuation. Finally, by shifting Callidus's balance sheet away from debt positions to equity positions in former borrowers, the risk profile of the company has deteriorated, further undermining its financial condition. In May 2017, Callidus announced that the OSC also had required Callidus to make a material change in the manner in which it presented its financial statements.

84.     In response to continuing weakness in Callidus's share price, and in an effort to harm short-sellers (which Catalyst and Callidus believed incorrectly included West Face), Callidus has engaged in a prolonged and aggressive campaign to prop up its share price:

(a)     First, in March 2016, when Callidus's shares were trading at less than $10 per share, Callidus announced a substantial issuer bid ("**SIB**") for up to $50 million at $14 per share. The purpose and effect of the SIB was to inflate artificially Callidus's share price, because investors knew that they could buy Callidus shares and tender to the SIB for $14. The SIB was extended several times and the price of that Bid was eventually increased by Callidus to $16.50;

(b)     Second, in late September 2016, when Callidus's shares were trading at less than $17 per share, it announced a proposed initiative to take Callidus private. Callidus later indicated a target completion date of June 2017. No such transaction has yet been concluded, however, because no arm's length third party has been willing to pay what Callidus had indicated is the target price of $18 to $22 per share for Callidus's shares after having conducted diligence into the company;

(c)     Third, at approximately the same time as it announced its proposed privatization transaction in October 2016, Callidus increased its monthly dividend; and

(d)     Fourth, in January 2017, Callidus commenced a normal course issuer bid ("**NCIB**") for up to 5% of its total issued and outstanding shares. The purpose and effect of the NCIB was to support the Callidus share price.

85.        None of these measures had any appreciable long-term, lasting effect on Callidus's share price, because none of them improved Callidus's underlying business or financial performance.

86.        As of the date of this amended pleading, Callidus's shares are trading at a price of less than $7 per share. Moreover, in its most recently released financial statements (for year-end and Q4 2017), Callidus disclosed a net loss of $218.5 million for 2017. Far from expanding its portfolio of loans (as required to justify a premium to book value) over the twelve months from December 31, 2016 to December 31, 2017, Callidus's net loans receivable fell from over $1 billion to under $250 million. Much of this decline was caused by Callidus acquiring its borrowers and writing down loans, rather than by the repayment by borrowers of debts owing to Callidus.

**E.    The Conspiracy**

87.        The events relating to WIND and Callidus described above were intolerable to the Catalyst Defendants and led directly to the formation and implementation of the conspiracy referred to herein. The Catalyst Defendants risked a loss of investor confidence and an inability to raise investor funds in the future if it became known that:

> (i)    Callidus was failing, such that funds administered by Catalyst would not be able to exit their significant investments in Callidus without suffering significant losses;
>
> (ii)   Catalyst had failed to acquire WIND because of its own failed strategies, intransigence, and mismanagement of negotiations with the seller of WIND rather than because of conduct engaged in by West Face; and

    (iii)    there was no proper basis for the enormous valuations Catalyst had placed on its contingent claims relating to WIND in its representations to its investors.

88.    The Catalyst Defendants therefore decided in August 2017 to engage in a two-pronged campaign to discredit West Face and Boland. These two prongs were the Black Cube Campaign and the Defamation Campaign, as particularized below. The Catalyst Defendants enlisted the assistance of the other Counterclaim Defendants in implementing both of these Campaigns. All of the Counterclaim Defendants were active participants in the conspiracy described herein.

## F.    The Black Cube Campaign

89.    In the period from August 2017 through at least December 2017, the Counterclaim Defendants conspired with each other, and with other co-conspirators who are known to the Counterclaim Defendants but presently unknown to West Face, to unlawfully harass, intimidate and deceive persons who are or were employed by or connected to West Face or played important roles in the litigation described above between West Face and Catalyst. The purpose and effect of the Black Cube Campaign was to harm West Face and Boland. The Black Cube Campaign was carried out by the Counterclaim Defendants using a series of deceitful, fraudulent and otherwise unlawful means.

90.    Remarkably, one of the targets of the Black Cube Campaign was Justice Newbould, who, as stated above, rendered the trial judgment in favour of West Face in the Moyse Action in August 2016. One of the central goals of the "sting" perpetrated against Justice Newbould was to entrap him into making anti-Semitic comments, thus insinuating that Justice Newbould decided the Moyse Action in the way that he did

because he was biased against Glassman, who is Jewish. The Counterclaim Defendants intended to use the results of the sting against Justice Newbould to attack and discredit him and his Decision in favour of West Face in the Moyse Action, both in Catalyst's appeal to the Court of Appeal for Ontario from the Decision of Justice Newbould dismissing Catalyst's claims against West Face in the Moyse Action and in the VimpelCom Action. The ultimate targets of this orchestrated attack on Justice Newbould were West Face and Boland. While Black Cube's effort to elicit anti-Semitic remarks from Justice Newbould failed, the purpose and effect of this and other elements of the Black Cube Campaign was to delay the hearing of Catalyst's appeal in the Court of Appeal in the Moyse Action, to delay the outcome of the Defendants' motions to strike in the VimpelCom Action, to cast a cloud of doubt and uncertainty over West Face's victory in the Moyse Action, and to shroud West Face and Boland in contention and controversy.

91.　　　　As set out above, Black Cube is an investigative firm comprised of former members of the Israeli Defence Force and the Mossad, Israel's national intelligence agency. The Catalyst Defendants retained Black Cube, directly or indirectly through Yosef Tanuri, also known as Yossi Tanuri (whose personal identification number in Israel is 28541431) ("**Tanuri**"). Tanuri is a former commander of an elite unit of the Israeli Defence Force and the owner and proprietor of Tamara Global Holdings 2016 Ltd. (its company number is 51-540445-7). Tanuri acted as an intermediary between the Catalyst Defendants and Jamieson, Rosen, Black Cube and Psy Group. Black Cube was used to elicit confidential and privileged information from West Face's current and former employees, business contacts, and their family members, and in an attempt to

elicit potentially damaging information or statements from Justice Newbould. The purpose of these activities was to use the information and materials that Black Cube was able to obtain: (i) in their campaign of defamation against West Face and Boland; (ii) in various ongoing lawsuits that had been or were about to be commenced against West Face and Boland by Catalyst and/or Callidus; (iii) against West Face in Catalyst's appeal to the Court of Appeal in the Moyse Action, as well as in the VimpelCom Action; and (iv) in an effort to "plant" damaging articles and media coverage concerning Justice Newbould, West Face and Boland in, among other publications, the *National Post*, the Associated Press and Bloomberg News. Those efforts were ongoing at least as recently as April 2018.

~~92.~~         West Face only uncovered the Black Cube Campaign as a result of widespread media coverage in the United States and globally concerning Black Cube because of its involvement <u>in two United States matters where Black Cube is alleged to have engaged with individuals under false pretenses.</u>~~in a public scandal. In particular, West Face learned through the mainstream and on-line media that:~~

> ~~(a)     Hollywood producer Harvey Weinstein is alleged by numerous women to have engaged in outrageous predatory and criminal behaviour, including sexual harassment and assault;~~

> ~~(b)     Weinstein, through counsel, hired Black Cube to investigate both women and journalists who were about to disclose Weinstein's actions; and~~

> ~~(c)     Operatives of Black Cube acted under false pretences to insinuate their way into the lives and confidences of Weinstein's victims in order to~~

extract information that could potentially be used against them. One of Black Cube's investigators who played an active role in the Weinstein matter was identified publicly as "Stella Penn Pechanac". Media coverage and coverage over the Internet concerning the involvement of Black Cube in the Weinstein scandal included photographs and at least one video of Ms Penn Pechanac.

93.     West Face only learned of the conduct of Black Cube complained of in this proceeding in November 2017 when this media coverage resulted in West Face employees, who had been targeted by operatives of Black Cube, recognizing Stella Penn Pechanac as one of the individuals who had solicited and met with them under what turned out to be false pretences. Widespread media coverage pertaining to the prominent role played by Black Cube in the United States matters Weinstein scandal led directly to the discovery by West Face and Boland of the Black Cube Campaign against them.

94.     Black Cube's conduct was undertaken for and on behalf of the Catalyst Defendants as part of the conspiracy described above, and was unethical, improper and unlawful in a number of respects. First, private security and investigative services are legally regulated in Ontario by the Ministry of Community Safety and Correctional Services. In particular, private investigators are subject to the *Private Security and Investigative Services Act, 2005*, S.O. 2005, c. 34 ("*PSISA*") and the regulations made under it. The *PSISA* prohibits carrying on business as a private investigator in Ontario without being licensed under that statute. Neither Black Cube nor any of its individual operatives were licensed private investigators in Ontario during the period in question.

95.     Second, Black Cube operatives did, in fact, contact and meet in Toronto –
under false pretenses – with a number of West Face's current and former employees,
their family members, and others, as well as with Justice Newbould, using lies and
systematic deception. Black Cube operatives secretly recorded these meetings, created
transcripts of what occurred, and conveyed these transcripts, recordings and related
documents and information to the Catalyst Defendants, either directly or indirectly
through intermediaries (the "**Black Cube Evidence**"). Heavily edited and distorted
versions of those transcripts and recordings were then used by the Counterclaim
Defendants to implement their ongoing campaign of harassment and defamation
against West Face and Boland, including in false and misleading statements made to
members of the media referred to above, as well as to investors of Catalyst and Callidus
and to current and potential investors of West Face.

96.     Third, Black Cube's conduct included: (i) making deceitful and false offers
of employment to several current and former employees of West Face; (ii) making
deceitful and false expressions of interest in making investments with a former
employee of West Face; (iii) making deceitful and false statements to Justice Newbould
concerning his potential involvement in a non-existent arbitration proceeding; (iv)
inviting their targets to meetings, lunches or dinners under false pretenses, and
encouraging their targets to drink alcohol liberally; (v) flying certain targets to London,
England for further meetings where they were taken to further fraudulent interviews
when jet lagged and tired; and (vi) ultimately attempting to entice their targets into
disclosing privileged and/or confidential information of West Face or making prejudicial
statements that could be used against the targets, West Face or Boland. In the case of

current and former employees of West Face, operatives of Black Cube enticed their targets to disclose confidential (and in at least one case privileged) information of West Face in breach of their contractual and/or professional obligations to West Face.

97.     The conduct of the Counterclaim Defendants in orchestrating and carrying out the Black Cube Campaign has harmed West Face and Boland in a number of respects. First, it has sown the seeds of distrust and suspicion among West Face and its current and former employees by subjecting them to deceitful and invasive intrusions into their privacy, and the risk of false and harmful media attention and coverage.

98.     Second, it has harmed West Face's ability to attract and retain talented employees, knowing that they too may be subjected to deceitful and invasive retaliatory measures like those engaged in by Black Cube for or on behalf of the Catalyst Defendants.

99.     Third, it has resulted in the unlawful disclosure of West Face's confidential, and in at least one case privileged, information to operatives of Black Cube and ultimately to the Counterclaim Defendants, including to all of the Catalyst Defendants. The disclosure of West Face's confidential and/or privileged information, in violation of confidentiality obligations in employment agreements and professional obligations, to both a competitor in business and an opponent in multiple lawsuits is inherently harmful.

100.     Fourth, the conduct of the Counterclaim Defendants in engaging or taking advantage of and utilizing the Black Cube Evidence to plant false and misleading media coverage concerning West Face and Boland was calculated to shroud West Face and

Boland in controversy and scandal, and to tarnish and undermine their reputations and their business by deterring investors and other market participants from doing business with West Face and Boland.

101.     Fifth, the conduct of the Counterclaim Defendants in causing, orchestrating, taking advantage of or utilizing Black Cube Evidence concerning its highly improper "sting" against Justice Newbould is particularly egregious, and was intended to prejudice to the greatest extent possible the positions of West Face both publicly, with investors and potential investors, and in defending and responding to Catalyst's appeal in the Court of Appeal for Ontario from the trial decision of Justice Newbould in the Moyse Action and in pursuing its own motion to stay or dismiss Catalyst's claim in the VimpelCom Action.

102.     On the instructions of the Catalyst Defendants, operatives of Black Cube met with Justice Newbould twice under false pretences on September 18, 2017, in his office and at dinner. They lied to and deceived Justice Newbould and attempted repeatedly to entrap him into making anti-Semitic comments that could then be used by Catalyst: (i) to attack Justice Newbould's honesty, integrity, conduct and character, including through highly negative and pre-arranged media coverage on the eve of the hearing of the appeal in the Moyse Action; and (ii) as "fresh evidence" in the Court of Appeal for Ontario, to allege that Justice Newbould acted improperly, with actual bias, in deciding the Moyse Action against Catalyst because Glassman is Jewish.

103.     Even though operatives of Black Cube failed in their efforts to entrap Justice Newbould into making anti-Semitic comments, they and the Counterclaim

Defendants, including specifically Glassman, Riley, Jamieson, and Rosen, persisted in their efforts to plant highly negative media coverage concerning Justice Newbould. Their objective in doing so was to call into question the validity of the judgement West Face had obtained at trial in the Moyse Action, and to further shroud West Face and Boland in controversy and scandal. Efforts to plant stories concerning the sting on Justice Newbould were made by or on behalf of the Catalyst Defendants both in the period immediately preceding the hearing of the appeal in the Moyse Action, which was originally scheduled to be argued on September 26 and 27, 2017, and in the period after the Catalyst Defendants engineered an adjournment of the appeal during an attendance before Justice Rouleau of the Court of Appeal on the afternoon of September 25, 2017.

104.     In particular, on Sunday, September 17, 2017 (the day before Black Cube's failed sting operation against Justice Newbould), at the direction of the Catalyst Defendants, Jamieson contacted Blatchford, a prominent business journalist at the *National Post*, as set out above, promising an exclusive story concerning Justice Newbould. At the direction of the Catalyst Defendants, Jamieson provided Blatchford with an inaccurate and incomplete summary of the Moyse Action; falsely claimed that in deciding that action, Justice Newbould had ignored the destruction of relevant evidence; and alleged that West Face was involved in a "wolfpack" of companies that was unlawfully conspiring to harm various public market participants. Jamieson also offered to connect Blatchford to a spokesperson from Catalyst.

105.     Three days after operatives of Black Cube met with Justice Newbould, Jamieson met with Blatchford using lies and deception, on Thursday, September 21,

2017 at a café in midtown Toronto. At that meeting, Jamieson gave Blatchford a USB flash drive that had been provided to her by Riley. The USB flash drive contained photos, edited audio recordings and edited transcripts of two meetings between Justice Newbould and a Black Cube operative at Justice Newbould's office and at dinner.

106.     All of Jamieson's actions described above were orchestrated and directed by the Catalyst Defendants, directly or indirectly, as part of the conspiracy. Their purpose in doing so was to induce Blatchford to write and publish a false and defamatory article concerning West Face, Boland and Justice Newbould immediately before the appeal of the Moyse Action was heard on September 26 and 27, 2017.

107.     The co-conspirators failed in their efforts to do so, and no article was, in fact, published by Blatchford in respect of this matter in the period before Catalyst's appeal was first scheduled to be argued.

108.     On the afternoon of September 25, 2017, new counsel for Catalyst requested an adjournment of the appeal in the Moyse Action. He appeared before Justice Rouleau in open court and advised that the existing counsel for Catalyst from the Lax O'Sullivan law firm had withdrawn from the appeal because of an irreconcilable conflict that had only very recently arisen with Catalyst, and that he had been retained to pursue a potential motion for leave to adduce fresh evidence in the appeal. New counsel for Catalyst declined to reveal what the proposed fresh evidence was, or how or when Catalyst had obtained it. The hearing of the appeal was adjourned by Justice Rouleau to February 20 and 21, 2018 over the objections of West Face.

109.	Ultimately, Catalyst made the decision in late November 2017 not to proceed with its proposed motion to adduce fresh evidence in its appeal in the Moyse Action. Catalyst made that choice:

(a)	after the failed sting operation against Justice Newbould was disclosed by Blatchford in an article published in the *National Post* on November 24, 2017 titled "The Judge, the Sting, Black Cube and Me"; and

(b)	almost immediately after West Face brought a motion before Justice Rouleau for an Order compelling Catalyst to disclose the "fresh evidence" that it and its counsel had in their possession when the adjournment of the hearing of the appeal in the Moyse Action was sought and obtained on September 25.

110.	In the period following September 25, 2017, the Counterclaim Defendants (and others working with and for them as part of the conspiracy described herein) persisted in their efforts to plant highly negative media coverage using edited and distorted versions of the Black Cube Evidence that they intended to damage, and knew would be damaging to, West Face and Boland (including by undermining the legitimacy of Justice Newbould's dismissal of Catalyst's Claim against West Face in the Moyse Action). The efforts of the Counterclaim Defendants, and others on their behalf, were ongoing in this regard until at least as recently as April 2018.

## G.	The Defamation Campaign

111.	The Counterclaim Defendants' campaign of defamation against West Face and Boland was systematic, multifaceted and persistent. It was at all times carried

out with malice and in bad faith, for the reasons described above. It included as its principal elements the dissemination by or on behalf of the Counterclaim Defendants of a series of false and defamatory press releases, communications to Catalyst investors and other capital market participants, Internet postings, and communications to members of the media, including the *National Post*, Bloomberg News and the Associated Press. The campaign of defamation was carried out as part of the conspiracy entered into by the Counterclaim Defendants, described herein, to discredit and harm West Face and Boland.

     **(i)**     **False and Defamatory Press Releases and Statements Following the Issuance of Justice Newbould's Trial Reasons**

112.     On August 18, 2016, Justice Newbould released his Reasons for Judgment dismissing Catalyst's claims and allegations in the Moyse Action in their entirety. The very next day, Catalyst issued a statement containing the following defamatory words, which were reprinted in the *National Post* and various other publications (the "**Post-Judgment Comments**"):

> Additional evidence [had] come out since the Moyse litigation that [supported] the new case that alleges conspiracy and breach of contract.
>
> We are deeply disappointed by the decision and the severe indications of possible bias displayed by Judge Newbold *[sic]*. We believe that he did not give fair consideration to all of the evidence presented, ignored contradictory statements made by the defendants that are part of the court record and delivered a judgement containing clear misstatements of fact.

113.     All of the Catalyst Defendants played an active role in preparing, approving and disseminating these Post-Judgment Comments. The plain and obvious meaning of Catalyst's Post-Judgment Comments was that in acquiring WIND, West

- 51 -

Face and its principals, including Boland, had engaged in an unlawful conspiracy and breach of contract, and that Catalyst's allegations of breach of confidence made against West Face and its principals in the Moyse Action were, in fact, true, even though they had been dismissed the day before by Justice Newbould.

114.     The Post-Judgment Comments were false. No "additional evidence" supporting any of Catalyst's claims and allegations in the new litigation had "come out" in the period since the trial of the Moyse Action had concluded only two months earlier. Nor was there any proper or good faith basis for Catalyst to assert, as it did, that the only reason its claims against West Face were dismissed by Justice Newbould was that Justice Newbould had misconducted himself and acted with actual bias in presiding at trial in the Moyse Action. Catalyst made these statements in bad faith and with malice for the reasons described above, and for the purpose and with the effect of embarrassing West Face, Boland and Justice Newbould. Catalyst sought to further shroud West Face and Boland in contention and controversy while presenting the illusion to current and potential investors, participants in the capital markets and others, that it could substantiate the truth of the WIND Defamation, and of the entirely false allegations that Catalyst had made against West Face in the Moyse Action.

115.     On October 13, 2016, Catalyst issued a press release concerning West Face and Boland through the Business Wire news service containing the following defamatory statements (the "**October 2016 Press Release**"):

> It is exactly because of this culture at Catalyst, as compared to how others behave, that we have chosen to be incredibly tough and demanding when our rights are trampled or

counterparties act unethically. Because ultimately, it is our
LPs and investors that are impacted.

...

Catalyst has put its faith in the judiciary and expect that our
claims and appeals will be heard fairly and that judgment will
expose the truth of West Face's actions, character and
values.

116.     All of the Catalyst Defendants played an active role in preparing,
approving and disseminating the October 2016 Press Release. The plain and ordinary
meaning of the October 2016 Press Release was that:

(a)     West Face and its principals, including Boland, trampled unlawfully on
Catalyst's rights, and acted unethically and unlawfully in respect of WIND
and Callidus; and

(b)     West Face's actions, and the character and values of West Face and its
principals, including Boland, are consistent with having engaged in
questionable and unlawful actions with respect to WIND and Callidus.

117.     Each of these meanings is demonstrably false. The October 2016 Press
Release was published with malice, as part of a systematic, orchestrated and unlawful
campaign of defamation against West Face and Boland for the express purpose of
embarrassing and injuring Boland and West Face as well as its officers, employees and
directors as well as poisoning the relationship between West Face and its current and
potential investors.

118.     The purpose and effect of Catalyst's October 2016 Press Release was to
disseminate its false and defamatory allegations against West Face and Boland as

widely as possible, including among investors, other participants in the capital markets and other members of the business community. The Catalyst Defendants sought to continue to shroud West Face and Boland in contention and controversy, and succeeded in achieving their objective.

119.     In addition, in or about the same period from August to October 2016, Glassman repeated the defamatory words contained in the Post-Judgment Comments and the October 2016 Press Release in a variety of conversations and discussions with industry analysts, potential and current investors of both Catalyst and West Face, professional and business contacts of Boland and other market participants, the identities of whom are known to the Catalyst Defendants and not to West Face (the "**Glassman Defamation**"). On these same occasions, by repeating words contained in the Post-Judgment Comments and October 2016 Press Release, Glassman impugned the conduct, business integrity and ethics of Boland and his partners and colleagues at West Face.

120.     Among other things, in disseminating the Glassman Defamation, Glassman represented falsely that West Face and its principals, including Boland, had acted improperly, dishonestly and unlawfully in acquiring WIND, including by misusing confidential information of Catalyst that they had obtained from Moyse. Glassman also told investors and others that the trial decision of Justice Newbould contained numerous errors and would be overturned on appeal.

121.     The Glassman Defamation was false. As described above, and as found by Justice Newbould following a full trial of the Moyse Action, West Face and its

principals acted in an entirely reasonable, proper and lawful manner in participating in the acquisition and subsequent sale of WIND.

### (ii)    False and Defamatory Allegations to Catalyst Investors

122.    On or about August 14, 2017, in a letter disseminated to all of Catalyst's investors, Catalyst made the following false and defamatory statements concerning West Face (the "**First Investor Letter**"):

> As a brief update on the West Face and Wind litigation, new facts helpful to the case have been discovered. These relate not only to their stand-alone behaviour but also to possible market manipulation involving West Face and others in Callidus.

123.    Public information sources disclose that Catalyst's investors include the endowments of Harvard University, the University of Michigan, McGill University, the Missouri State Employees' Retirement System, the New Jersey Division of Investments, the Ohio Public Employees' Retirement System, and the Rockefeller Foundation. The identities of additional investors who received the First Investor Letter are known to the Catalyst Defendants, rather than to West Face or Boland. Moreover, given that West Face and Catalyst compete as managers of investment funds, each of Catalyst's investors who received the First Investor Letter is a potential investor in funds managed by West Face.

124.    All of the Catalyst Defendants played an active role in preparing, approving and disseminating the First Investor Letter to Catalyst's investors. The words contained in this First Investor Letter are defamatory in their natural and ordinary meaning. The words were meant and understood to mean that West Face and its

principals, including Boland, either directly or through its employees, officers and directors:

(a)     engaged in improper conduct intended to manipulate the market price for the shares of Callidus;

(b)     engaged in conspiracies with other people or entities intended to manipulate the market price for the shares of Callidus;

(c)     made misrepresentations to the public concerning Callidus; and

(d)     manipulated improperly other public market participants.

125.     Each of these meanings is false and defamatory. The First Investor Letter was published with malice, as part of systematic and unlawful campaign of defamation against West Face and Boland, for the express purpose of embarrassing and injuring Boland and West Face, as well as its other officers, employees and directors.

126.     Moreover, the First Investor Letter was false and misleading. As of the date the First Investor Letter was disseminated by Catalyst, no "new facts helpful to [Catalyst's] case" had been discovered. That statement was made to investors by Catalyst for the purpose, and with the effect, of presenting the illusion that Catalyst would finally be able to prove the truth of its allegations and claims against West Face and its principals in the Moyse Action, and to continue to shroud West Face and Boland in contention and controversy. As stated above, however, Catalyst's claims and allegations against West Face and its principals, including Boland, are now, and have always been, demonstrably false.

127.     West Face and its principals acted at all times in an entirely appropriate, lawful and responsible manner with respect to both WIND and Callidus. As described above, West Face determined in October 2014 that Callidus's shares were overvalued, and decided to short-sell its stock, based entirely on its analysis of publicly available information. Moreover, as explained in greater detail above, West Face's assessment of Callidus has been borne out by subsequent events. In the period since West Face first determined that Callidus was overvalued in October 2014, when the shares of Callidus were trading at over $20 per share, the share price of Callidus has fallen dramatically, and is currently trading below $7 per share. Moreover, Callidus has experienced significant loan losses, has been required by the OSC to restructure its financial reporting, and has experienced a dramatic reduction in the size of its loan book.

128.     The Catalyst Defendants published the First Investor Letter in furtherance of the conspiracy pleaded herein. The false and defamatory allegations of "market manipulation" in the First Investor Letter were specifically intended to tie into entirely false allegations of the Catalyst Defendants concerning the supposed participation of West Face and Boland in the "wolfpack" behaviour described below, and to distract attention from the *Wall Street Journal*'s August 9, 2017 Article describing "whistleblower" filings made against Catalyst and Callidus.

**(iii)     False and Defamatory "Internet Postings" of "Wolf Pack" Behaviour**

129.     On or about September 19, 2017, one week before the scheduled hearing of Catalyst's appeal in the Moyse Action, a series of false and defamatory Internet postings (the "**Internet Postings**") about West Face and Boland began to appear in a variety of locations on the Internet. These Internet Postings were posted under

pseudonyms, but were orchestrated, directed and paid for, directly or indirectly, by the Counterclaim Defendants.

130.     The first such Internet Posting uncovered by West Face (the "**Boland Post**") was titled "West Face Capital CEO Gregory Boland has made a fortune "shorting" companies, laying off thousands, then sells stocks high". In addition to the false and defamatory title, the Boland Post contained the following false and defamatory words concerning West Face and Boland:

> West Face Capital has used an aggressive strategy to take control of companies. It requires months, sometimes years of patience, before gutting the asset and selling off what is left of it for profit. Gregory Boland has used this tactic to great effect in conjunction with several partners.

> Boland typically targets weak companies to take advantage of cheap stock. But where no such stock exists, West Face and partners are now looking to create it. This pack of aggressive investors have taken to opening a shorts [sic] against target companies, before strong-arming boards of directors and restructuring companies. They then sell off assets for profit.

> In 2010, West Face surprised the board of Maple Leaf Foods after wresting away a third Ontario Teachers [sic] Pension Plan's 36-percent stake. What resulted was a third-year [sic] war between Boland and Maple Leaf CEO Michael McCain. Boland will often speak of the board's "independence" to cleanse of it of people [sic] who have long-standing business ties. The result is often conveniently removing multiple directors at once, handing West Face greater proportional control.

> "Corporate governance, and specifically director independence, became the focal point of Boland's attack, the lever by which he hoped to wrest power away from the McCains and make the company more responsive to the concerns of smaller investors such as—but not limited to—West Face," Listed Magazine wrote in spring 2011. He used similar strong-arming in 2008 to gut the entire board of Air Canada parent, ACE Aviation.

The "independence" arguments makes sense *[sic]* to most people trying to make managerial decision-making more efficient. Yet, it relies on pointing to inevitably strong working relationships between managers and directors as problematic, meaning true independence erodes over time. It makes for a great talking point for new players to weaken experienced directors for their own gain.

These tactics are not strictly illegal, but Boland has not exactly stayed out of the courtroom either. He has been accused of industrial espionage to one-up competitors, specifically regarding the acquisition of Wind Mobile in 2014. Alfred Balm sued Boland during another takeover, claiming the latter reneged on $10 million in stock sales after said stock dipped below the agreed sales price.

At Maple Leaf Foods, West Face and Boland eventually took a backseat in 2014 after years of infighting. Boland doubled his investment, with $300 million, even though the company posted losses in five of the last six quarters before the sale. He also left Maple Leaf with a $1 billion restructuring plan unfinished. Boland retained a spot on the board, but eventually gave that up in 2016.

The company's stock has risen, but the quest for profitability is still a ways off. The company laid off 400 workers, mainly in Mississagua *[sic]*, in 2015. When Boland departed a year later, they announced 400 more dismissals and the close of a factory in Thamesford, Ontario.

In an environment where distressed companies are easy prey, it seems West Face Capital has figured out a way to squeeze companies for its [*sic*] last few drops of life. Their tactics should be a lesson for anyone who thinks "independent" management and board "restructuring" are more than buzzwords. They are pretexts used by predatory investors.

131.     The Boland Post was published repeatedly over the Internet by or at the

request of the Counterclaim Defendants, directly or indirectly, including:

(a)     On a website found at http://greg-boland.blog/. This website bore the

defamatory heading "Greg Boland and West Face Scam", and contained a

link to the Boland Post at http://greg-boland.blog/2017/09/19/west-face-strategy-loveem-and-leaveem. The "author" of the Boland Post on this site is listed as "Anonymous", which provided a link to a page at http://greg-boland.blog/author/judgefranknewbould. While there was no additional content at the "author" page, the URL falsely suggests that Justice Newbould was somehow associated with the Boland Post. The purpose of associating Justice Newbould with the Boland Post was to attack his conduct and integrity, as well as to undermine the validity and reliability of his Judgment against Catalyst in the Moyse Action. As explained herein, this was not the only attempt of the Catalyst Defendants to attack Justice Newbould in an effort to harm West Face and Boland;

(b)     On a website found at http://u.wn.com, which bears the heading "West Face strategy: love'em and leave'em", and contained a link to the Boland Post at http://article.wn.com/view/2017/09/18/West_Face_strategy _love_em_and_leave_em/; and

(c)     By numerous Twitter accounts that provided links to the articles referred to above stating "To read more about corruption in the Canadian Stock Exchange *[sic]* click here", including but not limited to @joshccros, @Hiru3035Hirusha, @PearsallApril, @iamblessed2006, @AngelicaXoXoz, and @tox_icity. These Twitter accounts were established and managed, directly or indirectly, for, by or on behalf of the Counterclaim Defendants.

132.     The plain and ordinary meaning of the Boland Post is that:

(a)     West Face and Boland are predatory investors who intentionally harm companies and their employees for West Face and Boland's own private profit;

(b)     West Face and Boland were engaged in a "scam" and other unethical and improper, corrupt practices;

(c)     West Face and Boland conspired with unnamed third parties to make false and misleading statements about public companies in order to artificially manipulate and suppress their stock prices in support of an improper and unlawful short-selling strategy;

(d)     West Face and Boland engaged in "industrial espionage" with respect to West Face's participation in the acquisition of WIND in 2014;

(e)     West Face and Boland caused Maple Leaf Foods to suffer losses in five of six quarters, caused significant job losses, and failed to successfully complete a billion dollar restructuring; and

(f)     West Face and Boland drive companies into bankruptcy for their own private profit.

133.     Each of these meanings is false and defamatory. The Boland Post was published by or on behalf of the Counterclaim Defendants with malice, as part of their systemic and unlawful campaign of defamation against West Face and Boland and in furtherance of the conspiracy described herein, for the express purpose of

embarrassing and injuring Boland and West Face as well as its officers, employees and directors.

134.      The purpose, intent and effect of the Boland Post was to poison the relationship between Boland, West Face, and their current or potential investors, including by continuing to shroud West Face and Boland in controversy and scandal.

135.      The Boland Post was (and is) entirely and deliberately false. West Face and Boland have never "gutted" an asset and then sold off "what is left of it for profit". Nor have they engaged in unlawful stock manipulation, either alone or in conjunction with others. West Face and Boland have never "strong-arm[ed]" the Board of any company. Nor did they "sell off" the assets of any company for the private benefit of West Face or Boland. At all times, West Face and Boland have shared in the profit or loss of companies in which they have invested in the same manner as other investors in comparable securities.

136.      The Boland Post states, or in the alternative alleges by innuendo, that West Face's investment in Maple Leaf Foods was detrimental to Maple Leaf Foods. That statement or innuendo is also false. West Face and Boland's involvement with Maple Leaf Foods was entirely positive. When West Face acquired an interest in the company in 2010, its stock price was trading at less than $10 per share. As a result of a restructuring of the business of Maple Leaf carried out with the support of Boland and West Face, by the time West Face ended its involvement with Maple Leaf in 2016, the stock price was well over $25 and the company had returned to profitability.

137.    The purpose and effect of the Boland Post was to disparage the reputations of West Face and Boland, and to discourage improperly investors and other market participants from doing business with them.

138.    The second defamatory Internet Posting (the "**Wolf Pack Video**") was first posted on YouTube on or about September 19, 2017, and was titled "Judicial and Economical Corruption in Canada". The Wolf Pack Video was published by or on behalf of the Counterclaim Defendants using the online pseudonym "Wolf Pack". The defamatory text displayed on the Wolf Pack Video was as follows:

> BILLION-DOLLAR TORONTO "WOLF PACK" IS TRAPPING COMPANIES INTO STOCK SHORTS
>
> In June 2016, K2 & Associates took a short position in Asanko Mining...
>
> the miner had 90% downside potential; and soon Muddy Waters LLC took notice.
>
> UPON THE RELEASE OF THE MUDDY WATER *[sic]* RESEARCH, ASANKO'S STOCK BEGAIN *[sic]* TO TANK...
>
> K2 & ASSOC. IS WORKING WITH OTHER COMPANIES TO CREATE DISCOUNT STOCK BUYOUTS
>
> K2 & Assoc., Anson Funds, WestFace Cap., & MMCAP Fund Inc., are working together
>
> They are forming a "Wolf Pack" designed to target companies and bring them down.

139.    In addition, the description of the Wolf Pack Video on its YouTube page contained the following defamatory words:

> There is a new beast on the scene in Canada - The Wolfpack. Made up of a group of at least eight nefarious companies and their CEO's *[sic]*, The WolfPack has been operating for several years to take out their competitors

using 'short' tactics. By manipulating the stock market these companies guarantee that any business they target will fall into their hands. Spreading lies, committing purgery *[sic]*, even laundering money- The Wolfpack will stop at nothing to accomplish their goals.

With connections across Canada and into the United States, WestFace, Anson Partners, K2 Partners, along with several private investors like Mark Cohedes *[sic]*, and Alex Speers are operating largely undercover to carry our *[sic]* their short schemes. The list of WolfPack Members goes on and their reach is extensive, the Canadian credit market is in the midst of a major crisis.

Our mission is to expose these companies and the men behind them for what they really are and prevent further economic repercussions. There are at least four businesses that we can confirm have been affected by inducement actions carried out by the group, including: Badger Day lighting, EIF, Valeant Pharmaceuticals, and Concordia International. Each companies *[sic]* has had its shares depleted by the Wolf Pack's market manipulation to the point of declaring bankruptcy. The time has come to put an end to the manipulation and racketeering of these men and reinstate the public's trust in the financial system.

140.  The Wolf Pack Video was published repeatedly by or on behalf of the Counterclaim Defendants, directly or indirectly, including:

(a)  On YouTube at http://www.youtube.com/watch?v=o0K_L9OFUDc; and

(b)  On Twitter by numerous Twitter accounts that provided links to the video stated "Judicial and Economical Corruption in Canada", including but not limited to @dfrancis153, @webmaker_bd, @SaraMariohot82, @Arman_Arif44, @SunlightCity, @cool_coolm80, @rdmoot, @CassyxLove, @penslinger81, @happysnappy16, @nadia_neeka, @lordrose61, emlove2015, @WolflyHearted, @brandonn1768, @hasithamalinga2, @majharul521, @Nawamya148, @admschaaf,

@rainoforanges, @Emily_Grier001, @ManojAbey, @asansaranga1998, ThusithaDilana, @erangasperera1, @iamblessed2006, and @tox_icity. These Twitter accounts were managed, directly or indirectly, for, by or on behalf of the Counterclaim Defendants.

141.     The plain and ordinary meaning of the Wolf Pack Video is that:

(a)     West Face and Boland conspired unlawfully and improperly with other market participants to engage in corrupt conduct intended to harm, and ultimately cause the bankruptcy of, Asanko Mining, Badger Daylighting, Exchange Income Fund, Valeant Pharmaceuticals, Concordia International and other companies in order to profit from an unethical and illegal short-selling strategy;

(b)     West Face and Boland committed perjury, racketeering and money-laundering; and

(c)     West Face and Boland have engaged in illegal stock manipulation.

142.     Each of these meanings is false and defamatory. The Wolf Pack Video was published by or on behalf of the Counterclaim Defendants with malice, as part of a systematic and unlawful campaign of defamation, and as part of the conspiracy described herein, for the express purpose of embarrassing and injuring West Face and Boland as well as West Face's officers, employees and directors.

143.     The statements in the Wolf Pack Video mirror closely the entirely false allegations of misconduct made by Catalyst and Callidus against West Face and Boland

in their Claim in this proceeding and are entirely and deliberately false. West Face has never acted in conjunction with any of the other named entities, has never invested in the securities of Asanko Mining or any of the other named companies, has never engaged in corrupt behaviour, and has never worked with other parties "to target companies and bring them down". Those allegations were invented from whole cloth by the Counterclaim Defendants for the purposes of punishing and embarrassing West Face and Boland, and further shrouding them in controversy and scandal.

144.     The purpose and effect of the Wolf Pack Video was to disparage the reputations of Boland and West Face, and to discourage improperly investors and other market participants from doing business with West Face and Boland.

145.     The third defamatory Internet Posting (the "**Esco Post**") was first posted on or about September 19, 2017 by or on behalf of the Counterclaim Defendants, directly or indirectly, using the pseudonym "julesljones". This post contained the following defamatory words:

> **The Buyout That Wasn't**
>
> **The Truth Behind the Esco Marine Purchase and K2 & Associates**
>
> At the center of a large scale investigation sit several private Hedgefund companies, who through manipulation and insider information are quietly cornering the market. The group, although on the outside appear unconnected *[sic]* are in fact undeniably linked.
>
> Although the entire group is worthy of in depth analysis and probing, the topic of this brief expose is the connection between Anson Funds Corporation, K2 & Assoicates *[sic]*, Westface *[sic]* Capital and Esco Marine Inc.
>
> **Connecting The Dots**

In June 2014, Callidus Capital provided Esco Marine with a loan of just over US $20 million, as part of an agreement of up to US $34 million, to assist in financing its ongoing operations. Falling behind, Esco was forced to cease all operations and filed for bankruptcy protection from creditors on March 7 after their lender, Callidus Capital Corp, owned by Newton Glassman, called in a $31.4 million loan. Struggling to turn their scrap business around, ESCO Marine, Inc. filed for bankruptcy protection, or more accurately, had an involuntary bankruptcy petition filed against it, on March 7, 2015 . When Esco announced to investors that they couldn't pay, thereby declaring they were in default, a suit was filed against them by Callidus Capital.

The claim was filed with assistance from Greg Boland, the CEO of West face *[sic]* Capital. Boland, *[sic]* just happens to be close associate *[sic]* of Shawn Kimel, so close that the two hold office space for their respective companies in the same building in Toronto's financial district. Westface *[sic]* has a significant interest in acquiring control of Esco, the reason being that one of the major shareholders in the company is a well-known rival.

**The Big Game**

Getting back to the heart of the matter, Westface *[sic]* and Anson acted in cooperation with each other to bring the stock of the Texan Marine company down enough to crash their public tender and force them into selling. This tactic, commonly known as a 'short' isn't technically illegal...unless you are a company working in collusion with another vested interested *[sic]*.

Anson Funds are a collection of privately-held and pooled investment vehicles which dedicate funds primarily to publicly-traded equity and debt securities. Anson likes the risk, they target companies in the midst of financial turmoil and hope to turn a profit off of the investment they make that most banks refuse to give. Their two main offices are in Dallas and Toronto, which works quite well to transfer assets from Esco to Canadian investors. And now here is where it gets confusing...

Anson and West face share common stock and West face *[sic]* and K2 share office space, the proximity of these businesses to each other can't be ignored. Furthermore, Greg Boland (WestFace) and Shawn Kimel (K2&Associates)

both make donations to the Princess Margaret Cancer Foundation, making it likely that the pair are if nothing else associated with each other publicly. Barington/Hilco signed off on the acquisition of Esco Marine Inc, and guess who has strong interest invested in Hilco- Shawn Kimel of K2& Associates.

**How Hilco Connects**

Hilco Redevelopment Partners was one of the parties set to acquire, restart, and operate Esco Marine Inc. Hilco was in agreement with Callidus Capital to turn the business around. The plan was to have Hilco providing the industrial asset monetization and Callidus providing a loan facility. Hilco used one of its subsidiaries, HRP Brownsville for operations and as part of the agreement made with Callidus, HRP would receive $35 million USD. Callidus was set to retain and realize on all of Esco Marine Assets.

Upon the acquisition of ESCO by Hilco, a great deal of stock and any potential returns was lost to Callidus and directly sent to K2&Associates, AKA Shawn Kimel. Knowing what we know about the closeness of Kimel and Boland, it seems likely that the two were in contact with one another.

**In Conclusion**

Despite the fact that the story is still developing and a strong conclusion can't be drawn just yet, the evidence speaks for itself. There is cooperation between these groups, cooperation to bring down stock and purchase floundering companies at bottom prices. Their *[sic]* was a concentrated effort to target Esco and hurt the business of Callidus and the parties behind it aren't trying to hide their identities.

146.     The Esco Post was published repeatedly by or on behalf of the

Counterclaim Defendants, directly or indirectly, including:

(a)     On a website found at http://www.buzzfeed.com/julesljones/the-buyout-

that-wasn't;

(b)    On a website found at http://www.huffingtonpost.com/entry/the-buyout-that-wasnt-the-truth-behind-the-esco-marine_us; and

(c)    By numerous Twitter accounts that provided links to the articles above stating "The Truth Behind the Esco Marine Purchase and K2 & Associates", including but not limited to @tox_icity, @AngelicaXoXoz, and @warunad99. These Twitter accounts were managed, directly or indirectly, for, by or on behalf of the Counterclaim Defendants.

147.    The plain and ordinary meaning of the Esco Post is that:

(a)    West Face and its principals, including Boland, conspired with others to manipulate unlawfully the stock price of Esco Marine ("**Esco**"), thereby forcing Callidus to sell its investment and lose money;

(b)    West Face and its principals, including Boland, engaged illegally in insider trading;

(c)    West Face and its principals, including Boland, acted unlawfully and improperly in acquiring control of Esco, a failing company; and

(d)    West Face and its principals, including Boland, conspired with others to prevent Callidus from turning Esco's fortunes around.

148.    Each of these meanings is false and defamatory. The Esco Post was published by the Counterclaim Defendants with malice, as part of a systemic and unlawful campaign of defamation, and as part of the conspiracy described herein, for

the express purpose of injuring Boland and West Face as well as the officers, employees and directors of West Face.

149.     The Esco Post was (and is) entirely and deliberately false. Esco was at all times a private company to which Callidus extended a $34 million credit facility in June 2014. In March 2015, after Esco defaulted on its obligations under the credit facility, Callidus appointed a receiver over the assets of Esco. Callidus ultimately acquired Esco by bidding its debt in the insolvency proceeding, and then sued Esco's founders on their personal guarantees. That litigation has since settled on a confidential basis, the terms of which are unknown to West Face.

150.     As a private company, it is impossible to "short" the shares of Esco, which are not publicly traded. West Face has never had an investment in Esco, the business of which failed as a result of the actions of Callidus and not because of anything done by West Face.

151.     The purpose and effect of the Esco Post was to disparage improperly and unlawfully the reputations of West Face and Boland, to further shroud them in controversy and scandal, and to discourage improperly investors and other market participants from doing business with West Face and Boland.

152.     The fourth defamatory Internet Posting (the "**Face the Music Post**") was first posted on or about October 24, 2017 by or on behalf of the Counterclaim Defendants, directly or indirectly. This post contained the following defamatory words:

## West Face Capital – Time to Face the Music

West Face Capital (WF) appears to be losing face following a streak of dismal returns. The Toronto-based hedge fund, managed by activist investor Gregory Boland and considered a formidable player in its field with over $2 billion in assets under management, continues to deliver very weak results for its investors. The weakness of WF's financial results, which are low and unsatisfactory by any standard, is magnified even more when accounting for red-hot equity markets and their returns to every asset class. By their own account, WF is underperforming significantly compared to the S&P 500, the S&P/TSX composite, the Event Driven Distressed Hedge Fund Index, the Event Driven Activist Index and basically any other relevant index.

So what exactly is going on at WF? Have Boland and his team simply hit a bump in the road? Or is there a deeper story at play? It's difficult to tell from a simple analysis of WF's reports since the level of detail (rather, the lack thereof) makes it hard for even financial experts to understand what is hindering their numbers. Suffice to say that in an industry with loose regulation and oversight, to begin with, WF's near total lack of transparency and oversight compared to its peers stands out. It raises serious concerns.

Now consider that lacking transparency with the abovementioned, consistent underperformance. Taken together those concerns constitute alarm bells that cause any self-respecting investor with a bit of logic to take a step back and a very serious look at whether this is the place or people they want managing their money.

## Lack of Compliance

WF appears to have lied or misrepresented facts on its Form ADV reports, claiming it qualifies for exemption from registration since it acts solely as an advisor to private funds and has less than $150M in assets under management in the US. In reality, WF did not report assets under management for several US incorporated funds on its FORM ADV, including the West Face Long Term Opportunities (USA) L.P. which reportedly sold $849.46M in securities. Instead, WF reported this fund as a "feeder" to its Cayman Islands-based West Face Long Term Opportunities Global Master L.P., a fund that reports less gross assets.

WF's Form D and Form ADV simply do not match. Based on SEC filings, WF's estimated AUM exceeds $2.4 billion. The reduced reporting requirements WF has enjoyed since 2012 allows the firm to skate SEC scrutiny along with reduced reporting requirements. Similar SEC investigations into similar PE firms and hedge funds during the same period resulted in a significant enforcement action for undisclosed fees and expenses, failure to disclose conflicts of interest, misleading claims, and valuations, unauthorized shifting, allocation of expenses and more.

Finally, WF has been the subject of injunctions from several Canadian provincial authorities. The Alberta Securities Commission has heard four cases against them, the Ontario Securities Commission three. WF insiders have also failed to promptly report on SEDI (Canada's Electronic System for Disclosure by Insiders).

**Profit through management fees, no returns**

One of the main problems with funds like WF is their short-term gain approach. The appeal of making huge money through its performance fees often causes the fund's managers to take very big and very unnecessary risks.

In a recent interview, Greg Boland openly declared his true nature as a gambler and a thrill seeker, stating that "Being a contrarian and buying at the nadir of investor confidence has always appealed to me psychologically, I don't know why. The result is you often get some bumpy rides at the beginning. If you're trying to catch a falling knife, you can get a few nicks on the way down."

With the fund's performance so weak, well below its high watermark, Boland and his team will need to provide some very strong returns very fast if they want to continue enjoying the sweet, addictive taste of success fees. Combine these two factors together and add the lack of transparency or reporting requirements and you get a surefire recipe for some very risky and problematic deals in WF's near future.

In the meantime, WF's investors should take a very good, in-depth look at their investor and consider how lucky they really feel with the boat sailing through turbulent waters and a thrill-seeking, risk-taking captain at the helm, especially when it comes to OPM (Other People's Money).

153.    The Face the Music Post was published repeatedly by or on behalf of the Counterclaim Defendants, directly or indirectly, on the website u.wn.com.

154.    The plain and ordinary meaning of the Face the Music Post is that:

(a)    West Face and its principals, including Boland, carry on business improperly in secret, and with a "near total lack of transparency";

(b)    No "self-respecting investor" would invest funds with West Face or its principals, including Boland;

(c)    West Face and its principals, including Boland, have failed to comply with laws and regulations;

(d)    West Face and its principals, including Boland, have actively lied and misrepresented facts to regulators and investors;

(e)    West Face, under the leadership of Boland, is similar to other private equity firms and hedge funds that have been the subject of enforcement actions for undisclosed fees and expenses, failure to disclose conflicts of interest, misleading claims, and valuations, unauthorized shifting, allocation of expenses and more;

(f)    West Face has been the subject of a number of injunctions issued against it by Canadian provincial securities regulators, including the Alberta Securities Commission and the OSC; and

(g)     West Face and its principals, including Boland, take extraordinary and unnecessary risks at the expense of West Face's investors.

155.    Each of these meanings is false and defamatory. The Face the Music Post was published by the Counterclaim Defendants with malice, as part of an unlawful campaign of defamation, and as part of the conspiracy described herein, for the express purpose of embarrassing and injuring West Face and Boland, as well as the officers, employees and directors of West Face.

156.    The Face the Music Post is entirely and deliberately false. At no point has West Face failed to comply with all applicable laws and regulations. It has never lied or misrepresented facts to regulators. It has also never been the defendant or respondent in an enforcement or injunction proceeding brought against it by any Canadian provincial securities regulator.

157.    The purpose and effect of the Face the Music Post was to disparage unfairly and unlawfully the reputation of West Face and Boland, to further shroud them in controversy and scandal, and to discourage improperly investors and other market participants from doing business with West Face and Boland.

158.    The fifth defamatory Internet Posting was published for, by or on behalf of the Counterclaim Defendants, directly or indirectly, on or about October 30, 2017 (the "**Wolfpack Corruption Post**"). The Counterclaim Defendants, or others acting for them or on their behalf, created and posted a website, www.wolfpackcorruption.com, that is entirely dedicated to defaming West Face, Boland and other parties. This website was posted in conjunction with a YouTube video and with two Twitter accounts,

@WolfPackCorrupt and @WolfPackScam, all of which directed viewers to visit that same website. The Wolfpack Corruption Post and the @WolfPackCorrupt and @WolfPackScam Twitter feeds all used consistent graphics and logos.

159.     The Wolfpack Corruption Post contained the following defamatory words:

**The Wolfpack's Corruption**

*A wolf stalks its pray from the shadows, waiting for the right moment to pounce.*

*When hunting as a pack, their pray is under attack from all sides.*

The Wolfpack chews up its targets and spits them out. Like Little Red Riding Hood without the happy ending, publicly traded companies are hit hard by an avalanche of false charges. A blizzard of lies collects momentum, snowballing down the mountain on unsuspecting companies who can't compete with the Wolfpack's ability to destroy target company reputations with little insinuation.

With an allusion to a cooked book or a hint to a conflict of interest, the Wolfpack is a shadowy cabal of short sellers that distort company reputations to drive stock prices down. They prey on investor tendency to jump at rumors, creating a cascade of rumor to profit off stocks they decide to short.

This is the story of an unsuspecting company, delivering its products to customers down the long and winding path in the forest that is Bay Street. But the path is not a safe one despite the scenic Canadian wood and tweets of the birds in the trees. Those woods hide predatory speculators and market manipulators.

Those tweets, hit pieces and speculative reports carry rumors that turn investors against your company, marking your fresh red hood not as a respected brand but a target. Not as a worthy investment, but a stock about to nosedive.

Those rumors are simple to spread. The wolves in the forest are the likes of Anson Funds, K2 & Associates, West Face Capital, MM Asset Management and the American short seller Mark Cohodes. The Riding Hoods? A growing list of

victims like Nobilis, Home Capital Group, Concordia and Equitable Group are in the trenches against the Wolfpack's financial war machine.

The Wolfpack develops stories about their targets based on minutia of evidence, amplifying mild foibles to twist them into death knells for these companies. Few victims have survived their wrath. Some have defeated negative projections handedly. Others have successfully gone to war in court. The inept judges know their game. The weak courts know their pattern. The hamstrung regulators have seen it, too.

Now you have a chance to catch these wolves in action and save your investments. Learn here how Toronto's Wolfpack shorts and distorts target companies to make quick money.

160.    The plain and ordinary meaning of the Wolfpack Corruption Post is that:

(a)    West Face and its principals, including Boland, are part of a group of co-conspirators (i.e., a "wolfpack" or "shadowy cabal" of companies) engaged in stock manipulation of public companies;

(b)    West Face and its principals, including Boland, have conspired with others to launch a campaign of deception and misinformation (using "an avalanche of false charges", a "blizzard of lies", and "cascade of rumour") to "destroy" improperly and unlawfully the reputations of public companies and manipulate their stock prices; and

(c)    Any legal successes enjoyed by West Face or its co-conspirators have been the result of an "inept judge" or "weak courts", as opposed to merit.

161.    Each of these meanings is false and defamatory. The Wolfpack Corruption Post was published for, by or on behalf of the Catalyst Defendants with malice, as part of a systematic and unlawful campaign of defamation, and as part of the conspiracy

described herein, for the express purpose of injuring Boland and West Face as well as its officers, employees and directors.

162.     The Wolfpack Corruption Post is deliberately false and defamatory. As set out repeatedly above, West Face and Boland have never conspired with any of the above-noted companies to short-sell any stocks.

163.     The purpose and effect of the Wolfpack Corruption Post was to embarrass and disparage the reputations of Boland and West Face, to further shroud West Face and Boland in controversy and scandal, and to discourage improperly investors and companies from doing business with West Face and Boland.

164.     Indeed, as touched on above, on the same day that the Counterclaim Defendants published the Wolfpack Corruption Post (October 30, 2017), they also published, or caused to be published, either directly or indirectly, a YouTube video titled "Market Manipulation in Canada". The YouTube video took the form of a short "Breaking News" segment about how the Canadian financial markets had been "rocked by allegations of insider trading, market manipulation, and interference by a well-known group of short-sellers". While the YouTube video did not expressly refer to West Face by name, scrolling across the bottom of the YouTube video were the words: "Visit: wolfpackcorruption.com for more information". The purpose and effect of the YouTube video was to ensure that as many Internet users as possible would visit the Wolfpack Corruption Post to maximize the damage to the reputations of Boland and West Face. The YouTube video was also defamatory of West Face and Boland.

165.     In addition, the Counterclaim Defendants republished the Wolfpack Corruption Post by tweeting or causing to be tweeted links to it from the @WolfpackCorruption Twitter feed, which has since had all of its tweets deleted.

166.     The sixth false and defamatory Internet Posting (the "**WestFace.net Post**") was posted on or about November 6, 2017 for, by or on behalf of the Counterclaim Defendants, directly or indirectly. This was yet another website created by the Counterclaim Defendants for the purposes of embarrassing and defaming West Face, Boland and their alleged co-conspirators. This post contained the following defamatory words:

> **A Company Desperate to Maintain a False Image**
>
> In the world of hedge funds and money managers, there are those you can trust to make accurate and timely investments, and those who take what prove to be unnecessary risks with a hope of return that is never met. West Face Capital, a Toronto-based hedge fund, has come under intensive scrutiny as of late for several discrepancies in their reports, which have led financial market experts to raise red flags.
>
> According to the S&P 500, a widely-regarded and entrusted gauge for determining the profitability and reliability of large-cap U.S. equities, West Face Capital is falling short in almost every performance index. Data, which includes backdated reports on five year, three year and one year revenues, highlight the shockingly meager account with which the investors have been presented. As the business operates in both Canadian and American markets, there are also detailed reports available on the TSX index that corroborate West Face's poor returns.
>
> While the hedge fund claims one thing, the visible results as of June 2017 show that the S&P 500 has gone up 19.9% over the last year and West Face's index went up only 2.8%.
>
> This means that by choosing to invest in the S&P or in other top American stocks, you would have yielded 539% more

revenue than if you were to invest in West Face. Their credibility is on rocky terrain, as they continue to vehemently deny any trouble in their portfolio. The TSX reports yield a similar conclusion, with an increase of 11% over the past year, 292% better than West Face. An investor who would willingly purchase options through West Face in this market, or consult their money managers in this state, is putting their money in the trust of a company with zero idea of how to read the current market.

## Riddled with Manipulation and Falsified Reports

What should trouble investors is the lack of transparency in West Face's financial reports and in their communications with their clients. Canadian-based hedge funds tend to enjoy more lax regulation than their American neighbors, and West Face Capital is taking full advantage of this. The company employs no outside auditors. This means that investors are letting the fund manage their capital and compile their reports with virtually no outside scrutiny. It does not take a financial expert to recognize the potential for misconduct in this situation.

In light of this, and with all the accompanying suspicion, it is truly a wonder that West Face Capital, run by CEO Greg Boland, manages to maintain a client base at all. The reason lies in a sophisticated web of manipulation that has lulled investors into a false sense of security. These investors are not dumb —far from it — but West Face Capital has perfected a scheme of manipulating funds and revealing just enough information to keep their clients and business partners in the dark about their actual worth. They consistently report gains when the harsh reality reflects a string of near-crippling losses.

## Activist Investing to Suit Their Own Needs

West Face, under the direction of Greg Boland, utilizes an activist investor approach that is not well received. Activist investors focus more on securing their own interests rather than promoting the needs of their clients: Rather than improving the companies they work with, activist investors position their own people within existing company structures in order to push their agenda forward. Several companies in the past few years have issued major complaints against West Face after falling victim to activist techniques. West Face's rearrangement did little to improve their portfolios,

and instead shook up existing business structures with no benefit.

It would be remiss not to mention one of the largest issues with West Face Capital; an issue that may confirm claims of misconduct and market manipulation more than any other. A private firm found evidence that West Face Capital has not been reporting assets under management for several US incorporated funds on its Form ADV since 2012. In addition, the most recent Form ADV reports that West Face Capital qualifies "for the exemption from registration" because it acts as the sole adviser to private funds and has assets under management of less than $150 million.

**Wise Investors Should Look Elsewhere**

This, however, is a blatant lie. This exemption has permitted West Face to escape SEC examination and allowed for reduced reporting. The form D and Form ADV for West Face do not match, and based on SEC filings, the investment management firm's AUM is estimated to be more than $2.4 billion. Suspicion of non-compliance with SEC regulations is high, and their relation to the OEC is largely thought to be the same. Coupled with the fact that West Face has been late in filing with SEDI over 16 times, this is a factor that cannot be ignored. West Face Capital is desperately trying to maintain their image amidst obvious inequities, and their behavior is deplorable. Any sound-minded individual who hopes to preserve their portfolio's worth would be wise to think twice before putting their money into the hands of this company.

167.     The WestFace.net Post was published for, by or on behalf of the Counterclaim Defendants, directly or indirectly, on a newly-created website titled "WestFace.net". This website was registered by or on behalf of the Counterclaim Defendants on October 24, 2017 under the pseudonym "Jordan Brown". On that same day, "Jordan Brown" also registered GregBoland.net, though that website has not yet become active. The clear and malicious intent of the Counterclaim Defendants in

posting or causing this defamatory statement to be posted was to ensure that the website would appear prominently in any search results for West Face or Boland.

168.     The plain and ordinary meaning of the WestFace.net Post is that:

(a)     West Face and its principals, including Boland, have maintained a "false image" and cannot be trusted by investors;

(b)     West Face and its principals, including Boland, take unnecessary and imprudent risks with its investors' funds;

(c)     West Face and Boland are incompetent in that they have "zero idea of how to read the current market";

(d)     West Face and Boland have engaged in a "sophisticated web of manipulation" of West Face's investors;

(e)     West Face and Boland have acted unlawfully and improperly, and not in the best interests of West Face's investors;

(f)     West Face and its principals, including Boland, have engaged in misconduct and manipulation;

(g)     West Face and its principals, including Boland, have "blatantly lied" to regulators, investors and others, and have otherwise failed to comply with regulatory requirements; and

(h)     "Sound-minded" and "wise" investors should not invest their funds with West Face or Boland because they cannot be trusted, take unnecessary

risks, are incompetent, have engaged in misconduct and the improper manipulation of investors, and have failed repeatedly to comply with applicable laws and regulations.

169.     Each of these meanings is false and defamatory. The WestFace.net Post was published for, by or on behalf of the Counterclaim Defendants with malice, as part of a systematic and unlawful campaign of defamation, and as part of the conspiracy described herein, for the express purpose of embarrassing and injuring Boland and West Face as well as its officers, employees and directors.

170.     The WestFace.net Post is deliberately false and defamatory and was calculated to undermine and destroy West Face, Boland and their reputations. It strikes at the very heart of West Face's business by asserting expressly that investors should not invest their funds with West Face. At no point have West Face or its principals "manipulated" its investors. They have never lied or misrepresented facts to regulators.

171.     The purpose and effect of the WestFace.net Post was to disparage the reputations of Boland and West Face, to further shroud them in controversy and scandal, and to discourage improperly and unlawfully investors and other participants in the capital market from doing business with West Face and Boland.

172.     The Counterclaim Defendants and others working for or with them engaged in a number of techniques to make it extremely difficult for West Face and Boland to determine that they were responsible for and played a role in the creation and dissemination of the Internet Postings referred above. For example:

(a)   prepaid credit cards were used to pay for a number of the services and fees involved in posting the Internet Postings to the Internet, thereby concealing the identities of those paying for these services;

(b)   this unlawful and systematic campaign of defamation was carried out by or on behalf of the Counterclaim Defendants using a chain of non-party agents and representatives located around the globe, including in Israel, Montreal, Vancouver, India, and Bangladesh, such that the actual posters of the Internet Postings are out of the jurisdiction and did not know who they were working for or why;

(c)   the scheme involved the use of a number of fake identities, usernames and pseudonyms, including the illegal misappropriation and misuse of the identities of actual people, including "Judge Frank Newbould";

(d)   services were employed by or on behalf of the Counterclaim Defendants to optimize the dissemination of the Internet Postings in Internet search engines, such as Google, so that the Internet Postings would reach the widest possible audience; and

(e)   the scheme involved using multiple layers of intermediary Internet servers, making tracing the IP addresses of those responsible for the Internet Postings difficult to determine. However, ultimately the IP addresses responsible belong directly or indirectly to the Counterclaim Defendants.

173.     The Counterclaim Defendants all conspired to carry out the campaign of defamation described above, as they had agreed in or about August 2017. Among other things, they created, orchestrated and caused the dissemination of the various false and defamatory statements referred to above contained in the Internet Postings; drafted the text of the various defamatory Internet Postings; retained unnamed co-conspirators to draft and/or post and promote the various defamatory Internet Postings; and took steps to use false identities such as "Samantha Beth", "Alex Walker", "Jordan Brown" and "Judge Frank Newbould" in order to conceal their involvement. For example:

(a)     On or about August 13, 2017, Rosen or one or more of the other Counterclaim Defendants (falsely using the username "Alex Walker"), posted a message on Freelancer.com (a website that provides its users with an online marketplace through which employers can hire independent contractors – freelancers – to perform work) in which he stated that he was "looking for someone who can help me publish my website on tier 1 magazines in the U.S.". The person or persons posing as "Alex Walker" ultimately awarded this project to Amin Razvi ("**Razvi**"), an individual residing in India. The website in question was outlawbds.com, which is not itself a part of the defamation campaign against West Face and Boland;

(b)     On or around September 10, 2017, Rosen or one or more of the other Counterclaim Defendants (falsely using the username "Alex Walker") and Razvi began engaging in an instant messaging chat over Skype (a software application that allows its users to communicate in various ways

over the Internet, including video and voice calling, screen-sharing, and instant messaging);

(c)   On September 18, 2017, Rosen or one or more of the other Counterclaim Defendants (falsely using the username "Alex Walker") stated that he had sent Razvi's Skype contact information to a colleague of his, who Rosen indicated would contact Razvi soon. Rosen referred to this person as his "boss", and stated that her name was "Samantha Beth". Samantha Beth was in fact one of the Counterclaim Defendants, or acted on their behalf;

(d)   On or about September 18, 2017, "Samantha Beth" retained and directed Razvi to publish and disseminate the Boland Post. "Samantha Beth" sent Razvi an email containing the text of the Boland Post. Razvi published the Boland Post on WN.com (as set out above), after being directed and paid to do so by "Samantha Beth";

(e)   Similarly, on September 18, 2017, "Samantha Beth" sent Razvi an email containing the text of the Esco Post. Razvi published the Esco Post on the Huffington Post (as set out above), after being directed and paid to do so by "Samantha Beth";

(f)   In discussions with Razvi in or around September 18, 2017, "Samantha Beth" made it clear to Razvi that "her" priorities were for Razvi to publish the false and defamatory Internet Postings as quickly as possible, on as many websites as possible, and on websites that had the highest possible profiles. The Counterclaim Defendants played an active role in

orchestrating and directing this conduct, and in doing so sought to maximize to the greatest degree possible the harm that the dissemination of these false and defamatory Internet Postings could and would inflict on West Face and Boland. Acting in furtherance of the conspiracy described herein, "Samantha Beth" took all necessary steps to ensure that a number of the false and defamatory Internet Postings were disseminated as broadly as possible on the eve of the originally scheduled hearing in the Court of Appeal for Ontario of Catalyst's appeal in the Moyse Action. As stated above, that appeal was first scheduled to be argued on September 26 and 27, 2017, until Catalyst engineered an adjournment of the appeal on the afternoon of September 25, 2017;

(g)     Similarly, as set out above, the Boland Post was also published at http://greg-boland.blog/. The "author" of the Boland Post on this site is listed as "Anonymous", yet provides a link to a page at http://greg-boland.blog/author/judgefranknewbould. This blog was created on September 19, 2017, and while the username of the user that created this blog was "judgefranknewbould", the user's email was "sambeth381@gmail.com", and the user's address was 326 Bay Street, Toronto – a fictitious address that does not exist. In short, it was the Counterclaim Defendants who created this blog post, using the fictitious "Samantha Beth" persona, and they did so in such a way as to deliberately conceal and mislead its readers as to their involvement; and

(h)     Finally, on September 18, 2017, the Counterclaim Defendants used the same fictitious "Samantha Beth" persona, from the very same IP address as the user of the "sambeth381@gmail.com" account who had created the Boland Post, to create a second blog site at http://judgefranknewbould.wordpress.com and to purchase the judgefranknewbould.ca domain name. Notably, this was the day after Jamieson first emailed Blatchford with the "exclusive" story offer about Justice Newbould and West Face, and the very day of the failed sting conducted by operatives of Black Cube against Justice Newbould. The Counterclaim Defendants had drafted and intended to publish a false and defamatory article about Justice Newbould's "corruption" to this blog post, and would have done so had Black Cube's sting operation against Justice Newbould been remotely successful. The proposed title of this unpublished blog post was "A corrupt system or just a bad apple: how Justice Frank Newbould is destroying our faith in the Canadian judicial system". The ultimate goal of this planned but unlaunched attack on Justice Newbould was to cast a cloud of doubt and uncertainty over West Face's victory in the Moyse Action and to shroud West Face and Boland in contention and controversy.

174.    The Counterclaim Defendants conspired in a similar manner to publish the other Internet Postings. Further particulars of their conduct are known to the Counterclaim Defendants rather than to West Face and Boland.

(iv)     **False and Defamatory Communications with Reporters Regarding Black Cube Operations**

175.     In furtherance of the conspiracy detailed herein, upon receiving the Black Cube Evidence, the Counterclaim Defendants, including Black Cube, Psy Group, Jamieson, Rosen, Glassman and Riley, provided reporters, news agencies (including the *National Post*, Bloomberg News and the Associated Press), as well as others, with edited, distorted or otherwise falsified recordings and/or transcripts of meetings between operatives of Black Cube and their targets, including current and former employees of West Face as well as Justice Newbould (the "**Misleading Transcripts**"). The Counterclaim Defendants disseminated the Misleading Transcripts to members of the media repeatedly during at least the period from September to December 2017, in an unsuccessful attempt to cause these various news agencies to publish negative false and defamatory articles about West Face, Boland and Justice Newbould. Among other things, the Counterclaim Defendants provided transcripts to members of the media that had been edited or altered to provide the false impression that:

(a)     West Face and its principals, including Boland, had unlawfully received from Moyse confidential information belonging to Catalyst about WIND, and had used that information to their advantage;

(b)     West Face and its principals, including Boland, had concealed unlawfully the identity of West Face's investors; and

(c)     West Face and its principals, including Boland, had obtained unlawfully and misused confidential information regarding a wireless spectrum auction held in February 2015.

176.     All of these accusations were false and defamatory of West Face and

Boland, and were published to the *National Post*, Bloomberg News and the Associated

Press with malice, for the purpose of embarrassing and injuring West Face and Boland.

    **(v)     Further False and Defamatory Communications to Catalyst Investors**

177.     In furtherance of the conspiracy detailed herein, upon receiving the Black

Cube Evidence, the Catalyst Defendants prepared a further letter to Catalyst investors

that included portions of the Misleading Transcripts (the "**March Investor Letter**"). The

March Investor Letter was disseminated by the Catalyst Defendants to Catalyst

investors on or about March 19, 2018. Each of Catalyst's investors who received the

March Investor Letter is a current or potential investor in funds managed by West Face.

Moreover, the Catalyst Defendants were well aware when they disseminated the March

Investor Letter to numerous investors that the natural, ordinary and probable

consequence of doing so was that one or more of those investors would likely further

disseminate the March Investor Letter to others, including to members of the media.

That is precisely what happened.

178.     The Counterclaim Defendants disseminated the March Investor Letter to

Catalyst investors for the purpose and with the effect of harming West Face and Boland

and further shrouding them in controversy and scandal. Among other things, the March

Investor Letter deliberately mischaracterized and concealed the involvement and

deceitful conduct of operatives of Black Cube in allegedly "interviewing" former

employees of West Face. Moreover, the March Investment Letter contained extracts

from heavily edited and distorted transcripts of secretly recorded meetings involving

operatives of Black Cube and those former employees. Those meetings were arranged

and conducted by operatives of Black Cube for, on behalf of or at the direction of the

Catalyst Defendants under false pretences through the use of lies and deception. None

of this was disclosed by the Catalyst Defendants in the March Investor Letter. It stated,

among other things, the following:

> The interviews [*sic*; the "interviews" were in fact secretly recorded transcripts of Black Cube stings] in Catalyst's possession include statements made by a former West Face employee, who has extensive experience as a portfolio manager. This former employee has repeatedly indicated in his interview that inside information about the WIND negotiations was improperly leaked to West Face.

> This former employee expressed his belief that the West Face consortium had received inside information about the WIND negotiations as a result of which West Face was able to buy WIND by making a different bid with fewer conditions than Catalyst. Consequently, this employee stated that "I didn't work on the deal because I thought it was polluted."

179.     The March Investor Letter was defamatory. The plain and ordinary

meaning of the March Investor Letter was that West Face and its principals, including

Boland, had only been able to participate successfully in the acquisition of WIND by

using dishonourable and unlawful means, including by using "inside information" about

Catalyst's negotiations with VimpelCom.

180.     The March Investor Letter was false. As described above, West Face

used no inside information of Catalyst in acquiring WIND. Rather, Catalyst failed in its

bid to acquire WIND because of its poor choices, flawed negotiating strategy,

intransigence, and unreasonable, unrealistic and unachievable demands made by

Catalyst of the Government of Canada concerning significant regulatory concessions.

The quotation from a former West Face employee in the March Investor Letter was

distorted and taken out of context, and did not pertain to the improper use by West Face of confidential information of Catalyst's, which never occurred.

181.     As the Catalyst Defendants anticipated and intended, the March Investor Letter was provided by one or more of its investors to members of the mainstream media. On April 17, 2018, the Globe and Mail published an article titled "In Investor Letter, Catalyst Claims It Can Still Win Wind Mobile Suit", which repeated publicly the salient contents of the March Investor Letter. The publication of that article further shrouded Boland and West Face in contention and controversy, as Catalyst hoped and intended would occur.

**H.    Conspiracy**

182.     As pleaded above, the Counterclaim Defendants have engaged in both predominant purpose and unlawful means conspiracy in their efforts to inflict harm upon Boland and West Face.

183.     The Counterclaim Defendants entered into an agreement in or about August 2017 to act in concert, by agreement, and with the common design to:

(a)     punish, embarrass, discredit and harm West Face and Boland by disseminating false and defamatory statements about them that attacked their honesty, integrity, business ethics and conduct. The statements in question are referred to above, and include the Post-Judgment Comments, the October 2016 Press Release, the Glassman Defamation, the First Investor Letter, the Internet Postings, the Misleading Transcripts and the March Investor Letter; and

(b)    carry out the Black Cube Campaign.

184.    These various activities were all part of a co-ordinated strategy engaged in by the Counterclaim Defendants in furtherance of their conspiracy. They sought throughout to maximize the harm they inflicted on West Face and Boland, and used improper, unethical and unlawful conduct engaged in by operatives of Black Cube to do so. All of the Counterclaim Defendants were aware of and agreed to the overall strategy, and they all played an active role in implementing that strategy. Specifically:

(a)    The Catalyst Defendants were the original architects of the plan to destroy the businesses, careers, and reputations of West Face and Boland. Their objectives in doing so were to: (i) punish, humiliate and discredit West Face and Boland, including by shrouding them in controversy and scandal, with a view to deterring investors from entrusting them with their funds or resources; (ii) deflect attention from their own significant failings, including in respect of their failure to complete Catalyst's intended acquisition of WIND; and (iii) blame others, including West Face, Boland, and Justice Newbould, for their catastrophic losses in the business world and litigation;

(b)    The Catalyst Defendants enlisted the aid of and worked together with the other Counterclaim Defendants to punish, discredit and harm West Face and Boland, as described herein;

(c)     Rosen, Jamieson, Black Cube, and Psy Group collaborated with the Catalyst Defendants to develop, orchestrate and implement the specific plan to conduct the Black Cube Campaign and the Defamation Campaign;

(d)     The Counterclaim Defendants all participated actively in the Black Cube Campaign and the subsequent attempts of the Counterclaim Defendants to exploit, utilize and publicize the fruits of that Campaign;

(e)     The Counterclaim Defendants, directly or indirectly, published the Post-Judgment Comments, the October 2016 Press Release, the Glassman Defamation, the First Investor Letter, the Internet Postings, the Misleading Transcripts and the March Investor Letter, and acted with malice in doing so;

(f)     Rosen, Jamieson, Black Cube, and Psy Group retained persons known to the Counterclaim Defendants but unknown to West Face and Boland to write and disseminate the Internet Postings; and

(g)     Glassman, Riley, De Alba, Rosen, Jamieson, Black Cube, and Psy Group provided the Misleading Transcripts to journalists and to others, as described above.

185.    The conduct of the Counterclaim Defendants was directed at and intended to punish, discredit and harm West Face and Boland. As described above, the purpose and effect of the Counterclaim Defendants' activities was to damage the reputations of West Face and Boland, to undermine and destroy the business of West Face, and

otherwise cause harm to West Face and Boland in retaliation for West Face's recent success at Catalyst's expense as described above.

186.      The Counterclaim Defendants knew that harm was likely to result to West Face and Boland from their conduct, and such harm has in fact occurred. By deceiving market participants and investors into believing that West Face and Boland are dishonest, untrustworthy, incompetent and unethical, the Counterclaim Defendants deliberately tarnished and harmed their reputations in the financial and investing communities. This, in turn, has made it more difficult for West Face to raise and retain invested capital, attract and retain employees, and to make investments in other companies. Black Cube's activities also caused harm to West Face and Boland as described above.

## I.      Unlawful Means Tort

187.      The Counterclaim Defendants carried out their conspiracy through unlawful means, including their systematic and orchestrated campaign of defamation, their use of unlicensed private investigators, deceit, unlawful means tort, inducing breach of contract and confidence, invasions of privacy and inducing breach of fiduciary duty.

188.      As pleaded above, the Counterclaim Defendants' campaign of defamation had the purpose and effect of deceiving third-party market participants and investors into believing that West Face and Boland are dishonest, untrustworthy, incompetent and unethical. The Counterclaim Defendants made or caused to be made the false and

defamatory statements described above with malice, while knowing that they were utterly false.

189.     The Black Cube Campaign, carried out by, for or at the direction of the Counterclaim Defendants, also constitutes actionable wrongs against the targets of those activities, the full identities of whom are known to the Counterclaim Defendants. Among other things:

(a)     Operatives of Black Cube intentionally and fraudulently induced a number of the targets of the Counterclaim Defendants, including Justice Newbould, West Face's former general counsel Alex Singh, and a number of other current and former employees of West Face, to invest time and money, and even (in some cases) to fly to London, England, in pursuit of employment, professional engagements or investment opportunities that never existed. Operatives of Black Cube intentionally made false representations to the targets with the purpose and effect of causing them to rely on those representations to meet with Black Cube operatives and divulge to them confidential and privileged information, including information belonging to West Face;

(b)     Operatives of Black Cube induced current and former employees of West Face to breach duties of confidence owed to West Face pursuant to employment contracts and at law by offering them lucrative employment or investment opportunities provided the targets would disclose confidential information belonging to West Face;

(c)     Operatives of Black Cube induced West Face's former General Counsel Alex Singh to breach his fiduciary duties owed to West Face by falsely offering to him a potentially lucrative employment opportunity provided that he would disclose privileged communications that Mr. Singh participated in with his client (West Face) concerning the hiring and employment of Brandon Moyse. They did so by lying repeatedly to and deceiving Mr. Singh, flying him to London, England and then "interviewing" him at a high-end restaurant in London while he was jet lagged, consuming alcohol and being surreptitiously recorded; and

(d)     Operatives of Black Cube attempted repeatedly to induce or entice Justice Newbould into making anti-Semitic remarks during meetings at his office and at a restaurant in Toronto for the express purpose of enabling the Catalyst Defendants to utilize surreptitious and illicit recordings of Justice Newbould in multiple ways, including: (i) as "fresh evidence" in the Ontario Court of Appeal, in their efforts to rob West Face of the judgment it had obtained fairly at trial in the Moyse Action; (ii) in resisting motions to stay, dismiss or strike Catalyst's Claim that had been brought by West Face and other Defendants in the VimpelCom Action; and (iii) in false and defamatory statements that the Catalyst Defendants and other Counterclaim Defendants intended to disseminate and publish, including over the Internet, in their efforts to discredit, embarrass and punish Justice Newbould and cast doubt upon the legitimacy of the judgment West Face had obtained at trial in the Moyse Action. In doing so, the Counterclaim

Defendants hoped and intended to further shroud West Face and Boland in controversy and scandal.

190.     This conduct constituted the tort of deceit against the targets of Black Cube's campaign, and caused damage to West Face and Boland as described herein.

## J.     Inducing Breach of Confidence and Fiduciary Duty

191.     As described above, one aspect of the conspiracy engaged in by the Counterclaim Defendants was the Black Cube Campaign against Alex Singh.

192.     The Counterclaim Defendants were aware that as the former General Counsel of West Face, Mr. Singh owed West Face duties of confidence and fiduciary duties. Notwithstanding that awareness, the Counterclaim Defendants knowingly conspired with Black Cube to intentionally elicit from Mr. Singh, and to surreptitiously record, privileged and confidential information (including information concerning legal advice conveyed by Mr. Singh to West Face) pertaining to the hiring and employment of Moyse.

193.     After having obtained privileged and confidential information from Mr. Singh, including concerning his legal advice to West Face pertaining to the hiring and employment of Moyse, and with knowledge of the nature of that information, operatives of Black Cube promptly shared it with the Catalyst Defendants. The Catalyst Defendants received and utilized the contents of Mr. Singh's privileged and confidential communication with full knowledge of its privileged and confidential nature, thereby participating in the breach of confidence and breach of fiduciary duty committed thereby.

**K.    Damages**

194.        West Face and Boland have suffered significant damages as a result of the conduct of the Counterclaim Defendants pleaded above, including the Black Cube Campaign, the WIND Defamation, the Wolfpack Defamation and the Performance Defamation. Among other things, the negative publicity surrounding the Black Cube Campaign and the various Defamations has:

(a)    associated West Face with unsavoury events and allegations in the eyes of current and potential investors;

(b)    created the impression that anyone associated with West Face could potentially be the subject of "sting" operations or defamation, thereby deterring individuals from investing or associating with West Face;

(c)    scared away potential employees who could have helped grow and develop West Face's business, as a result of the risk that all West Face employees are potential targets of "sting" activities by sophisticated international intelligence operatives like Black Cube;

(d)    resulted in West Face employees resigning in order to remove themselves from the controversy associated with West Face and Boland;

(e)    caused West Face investors to redeem their investments and withdraw the proceeds in question from West Face's investment funds, thereby reducing the management fees that West Face can earn;

(f)     deterred potential investors from investing with West Face, thereby further

        reducing the management fees that West Face can earn;

(g)     forced West Face to delay distributing all of the legitimate proceeds from

        the sale of WIND to investors in West Face managed investment funds;

        and

(h)     forced West Face to incur hundreds of thousands of dollars in expenses

        associated with the retention of legal, investigative and technical advisors

        in order to determine who played a role in and is responsible for the

        conduct pleaded above.

195.     Boland has also suffered severe reputational harm as a result of the Black

Cube Campaign and campaign of defamation described in more detail above. His

conduct, ethics and character have been severely and repeatedly impugned, which has

harmed his ability to raise capital for business ventures at West Face and elsewhere

and has otherwise limited his ability to pursue his professional activities. Moreover,

Boland is personally registered with various securities regulators across Canada and

subject to the jurisdiction of U.S. regulators, and the conduct of the Counterclaim

Defendants has improperly endangered his standing and reputation with those

regulators.

196.     In the extraordinary circumstances of this case, very substantial awards of

aggravated and punitive damages are appropriate, having regard to the high-handed,

willful, wanton, reckless, contemptuous and contumelious conduct of the Counterclaim

Defendants. Their conduct, and the conduct of others acting for them or on their behalf,

has been truly deplorable and should shock the conscience of the Court. The sting on Justice Newbould described above, and the efforts of the Catalyst Defendants to take full advantage of that sting, amount to a full frontal assault on the administration of justice.

## L. The Catalyst Defendants Are Vexatious Litigants

197. The Catalyst Defendants should be declared vexatious litigants under section 140 of the *Courts of Justice Act*. Boland and West Face repeat and rely upon the Fresh as Amended Statement of Defence and on all of the allegations in this Fresh as Amended Counterclaim relating to the sting operation against Justice Newbould. Catalyst and Callidus, under the direction of Glassman, De Alba, and Riley, have commenced multiple, repetitive, vexatious and abusive proceedings against West Face and now Boland. These proceedings are manifestly without merit and have been brought for improper and collateral purposes, including to embarrass and harass West Face and Boland. Once commenced, the Catalyst Defendants have either allowed these meritless claims to lay dormant or have actively engaged in abusive litigation tactics to stall or delay the proper and final determination of their purported claims. Finally, the Catalyst Defendants' attempted "sting" on Justice Newbould constitutes an outright and highly improper attack on the proper administration of justice.

198. Remarkably, Catalyst has already stated publicly that it is considering bringing a motion under Rule 59.06 to amend, set aside or vary Justice Newbould's Judgment in the Moyse Action, despite already having lost its appeal of that Judgment in the Court of Appeal, and despite having abandoned its threatened motion for leave to introduce fresh evidence on that appeal. The Catalyst Defendants will continue to

engage in vexatious and abusive litigation unless and until they are restrained from doing so by this Honourable Court.

## M. Service Outside Ontario

199.     The Counterclaim Defendants may, without a court order, be served outside of Ontario pursuant to Rules 17.02(g) and (q), because the Counterclaim against the Counterclaim Defendants consists of claims in respect of a tort or torts committed in Ontario, and because the claims made in the Counterclaim are properly the subject matter of a counterclaim under the *Rules*.

200.     West Face proposes that this action be tried at Toronto.

May 2, 2018

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto ON  M5V 3J7

**KENT THOMSON (LSUC# 24264J)**
Tel.: 416.863.5566
Email: kthomson@dwpv.com

**MATTHEW MILNE-SMITH (LSUC# 44266P)**
Tel.:   416.863.5595
Email: mmilne-smith@dwpv.com

**ANDREW CARLSON (LSUC# 58850N)**
Tel.:   416.367.7437
Email: acarlson@dwpv.com

Tel.:   416.863.0900
Fax:   416.863.0871

Lawyers for the Defendants/Plaintiffs by Counterclaim, West Face Capital Inc. and Gregory Boland

TO:      SERVICE LIST

THE CATALYST CAPITAL GROUP INC. et al
Plaintiff

-and-

West Face Capital Inc. et al.
Defendants

Commercial Court File No. CV-17- CV-17-587463-00CL
Court File No. CV-17-586096

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**
PROCEEDING COMMENCED AT
TORONTO

## AMENDED AMENDED FRESH AS AMENDED STATEMENT OF DEFENCE AND COUNTERCLAIM OF WEST FACE CAPITAL INC. AND GREGORY BOLAND

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto ON M5V 3J7

**Kent Thomson (LSUC #24264J)**
Tel: 416.863.5566
Email: kentthomson@dwpv.com

**Matthew Milne-Smith (LSUC #44266P)**
Tel: 416.863.5595
Email: mmilne-smith@dwpv.com

**Andrew Carlson (LSUC #58850N)**
Tel: 416.367.7437
Email: acarlson@dwpv.com

Tel.:   416.863.0900
Fax:    416.863.0871

Lawyers for the Defendants/Plaintiffs by Counterclaim,
West Face Capital Inc. and Gregory Boland


Exhibit C

Court File No. CV-17-587463-00CL

**_ONTARIO_**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

THE HONOURABLE         )         TUESDAY, THE 9TH
                        )
JUSTICE HAINEY            )         DAY OF OCTOBER, 2018



B E T W E E N:

THE CATALYST CAPITAL GROUP INC. and CALLIDUS CAPITAL
CORPORATION

Plaintiffs

and

WEST FACE CAPITAL INC., GREGORY BOLAND, M5V ADVISORS INC.
C.O.B. ANSON GROUP CANADA, ADMIRALTY ADVISORS LLC,
FRIGATE VENTURES LP, ANSON INVESTMENTS LP, ANSON CAPITAL
LP, ANSON INVESTMENTS MASTER FUND LP, AIMF GP, ANSON
CATALYST MASTER FUND LP, ACF GP, MOEZ KASSAM, ADAM
SPEARS, SUNNY PURI, CLARITYSPRING INC., NATHAN ANDERSON,
BRUCE LANGSTAFF, ROB COPELAND, KEVIN BAUMANN, JEFFREY
MCFARLANE, DARRYL LEVITT, RICHARD MOLYNEUX and JOHN DOES
#1-10

Defendants

and

CANACCORD GENUITY CORP.

Third Party

A N D   B E T W E E N:

WEST FACE CAPITAL INC. and GREGORY BOLAND

Plaintiffs by Counterclaim

and

THE CATALYST CAPITAL GROUP INC., CALLIDUS CAPITAL
CORPORATION, NEWTON GLASSMAN, GABRIEL DE ALBA, JAMES
RILEY, VIRGINIA JAMIESON, EMMANUEL ROSEN, B.C. STRATEGY

LTD. D/B/A BLACK CUBE, B.C. STRATEGY UK LTD. D/B/A BLACK
CUBE and INVOP LTD. D/B/A PSY GROUP

Defendants to the Counterclaim

A N D  B E T W E E N:

BRUCE LANGSTAFF

Plaintiff by Counterclaim

and

THE CATALYST CAPITAL GROUP INC. and CALLIDUS CAPITAL CORPORATION

Defendants to the Counterclaim

**ORDER**
**(Production from Non-Parties)**

THIS MOTION, made by the Defendants (Plaintiffs by Counterclaim), West Face Capital
Inc. ("**West Face**") and Gregory Boland ("**Boland**", and together with West Face, the "**Moving
Parties**") against Google LLC and Google, Inc. (collectively "**Google**"), PayPal Inc. and PayPal
Canada Co. (collectively "**PayPal**"), and Canadian Web Hosting Inc. ("**CWH**") (collectively, the
"**Non-Party Respondents**") for the relief sought herein was heard on this day at the court house,
330 University Avenue, 7th Floor, Toronto, Ontario, M5G 1R7.

ON READING the Consent of the Moving Parties and Google, filed;

AND UPON NOTING the Order of The Honourable Justice Hainey in this Court dated
July 6, 2018 addressing the relief sought in this motion as against PayPal and CWH,

AND UPON BEING ADVISED by the Moving Parties and Google that the production
sought by the Moving Parties from Google in this motion concerns documents and information
that, if they exist, are within the possession, power, or control of Google in the United States, and
not in Canada;

AND UPON BEING ADVISED that the Moving Parties intend to commence a proceeding pursuant to 28 U.S.C. § 1782 in the United States District Court for the Northern District of California, the district where Google is headquartered, in which the Moving Parties intend to seek leave to issue a document subpoena to Google for the production of the documents and information sought by the Moving Parties from Google in this motion;

AND UPON BEING ADVISED that Google will not oppose an application pursuant to 28 U.S.C. § 1782 in the United States by the Moving Parties for leave to issue a document subpoena to Google;

1. THIS COURT DECLARES that the documents to be sought by the Moving Parties in the United States may be relevant and necessary to the just determination of the Moving Parties' Counterclaim in this Action, and the Moving Parties' intent to seek production of such documents in the United States is consistent with and not contrary to this Court's continued jurisdiction with respect to this Action and is not an attempt to circumvent the proof-gathering process in Canada;

2. THIS COURT FURTHER REQUESTS the assistance of the United States District Court for the Northern District of California in aiding the Moving Parties in obtaining documents from Google by the means ordinarily used in that jurisdiction to obtain documents from a non-party; and

3. THIS COURT ORDERS that this motion is hereby adjourned *sine die.*

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO:

OCT 0 9 2018

PER / PAR:

Court File No.: CV-17-587463-00CL

THE CATALYST CAPITAL GROUP INC., et al.    - and -    WEST FACE CAPITAL INC., et al.
Plaintiffs                                              Defendants
WEST FACE CAPITAL INC., et al.             - and -    THE CATALYST CAPITAL GROUP INC., et al.
Plaintiffs by Counterclaim                              Defendants to the Counterclaim
BRUCE LANGSTAFF                            - and -    THE CATALYST CAPITAL GROUP INC., et al.
Plaintiff by Counterclaim                               Defendants to the Counterclaim

*ONTARIO*
SUPERIOR COURT OF JUSTICE
Proceeding commenced at TORONTO

ORDER

CHERNOS FLAHERTY SVONKIN LLP
220 Bay Street, Suite 700
Toronto, ON  M5J 2W4

Tycho Manson (LSUC#: 38339C)
Tel:    416.855.0406
Fax:    647.725.5440

Lawyers for the Defendants, Plaintiffs by
Counterclaim, West Face Capital Inc. and
Gregory Boland



Exhibit D

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

B E T W E E N:

THE CATALYST CAPITAL GROUP INC. and CALLIDUS CAPITAL
CORPORATION

Plaintiffs

and

WEST FACE CAPITAL INC., GREGORY BOLAND, M5V ADVISORS INC.
C.O.B. ANSON GROUP CANADA, ADMIRALTY ADVISORS LLC,
FRIGATE VENTURES LP, ANSON INVESTMENTS LP, ANSON CAPITAL
LP, ANSON INVESTMENTS MASTER FUND LP, AIMF GP, ANSON
CATALYST MASTER FUND LP, ACF GP, MOEZ KASSAM, ADAM
SPEARS, SUNNY PURI, CLARITYSPRING INC., NATHAN ANDERSON,
BRUCE LANGSTAFF, ROB COPELAND, KEVIN BAUMANN, JEFFREY
MCFARLANE, DARRYL LEVITT, RICHARD MOLYNEUX, and JOHN
DOES #1-10

Defendants

and

CANACCORD GENUITY CORP.

Third Party

A N D  B E T W E E N:

WEST FACE CAPITAL INC. and GREGORY BOLAND

Plaintiffs by Counterclaim

and

THE CATALYST CAPITAL GROUP INC., CALLIDUS CAPITAL
CORPORATION, NEWTON GLASSMAN, GABRIEL DE ALBA, JAMES
RILEY, VIRGINIA JAMIESON, EMMANUEL ROSEN, B.C. STRATEGY
LTD. D/B/A BLACK CUBE, B.C. STRATEGY UK LTD. D/B/A BLACK CUBE
and INVOP LTD. D/B/A PSY GROUP

Defendants to the Counterclaim

A N D   B E T W E E N:

BRUCE LANGSTAFF

Plaintiff by Counterclaim

and

THE CATALYST CAPITAL GROUP INC., and CALLIDUS CAPITAL CORPORATION,
Defendants to the Counterclaim

**LETTER OF REQUEST**
**(LETTER ROGATORY REQUESTING INTERNATIONAL JUDICIAL ASSISTANCE**
**OBTAINING EVIDENCE FOR A CIVIL MATTER)**

**TO THE JUDICIAL AUTHORITIES OF:**

**THE STATE OF MASSACHUSETTS, UNITED STATES OF AMERICA**

**THE UNITED STATES DISTRICT FOR THE DISTRICT OF MASSACHUSETTS**
**1 COURTHOUSE WAY**
**BOSTON, MASSACHUSETTS 0221**

**A PROCEEDING IS PENDING IN THIS COURT** at the City of Toronto, in the Province of Ontario, Canada, between, among other parties, West Face Capital Inc. ("**West Face**") and Gregory Boland ("**Boland**") (together, Defendants in the Action and Plaintiffs by Counterclaim) and, among other parties, The Catalyst Capital Group Inc. ("**Catalyst**") and Callidus Capital Corporation ("**Callidus**") (together, Plaintiffs in the Action and Defendants by Counterclaim). On June 6, 2018, West Face Capital Inc. and Gregory Boland (together, the "**Moving Parties**") commenced a motion for production of evidence that is relevant to the Action/Counterclaim and that is in the possession, control or power of Endurance International Group, Inc. ("**Endurance**") and its affiliate, iPage

Hosting, LLC ("**iPage**", and together with Endurance, the "**Endurance Respondents**"), non-party respondents to the motion.

The Plaintiffs (Defendants by Counterclaim) have alleged claims of, *inter alia*, defamation, injurious falsehood, intentional interference with economic relations, civil conspiracy and unjust enrichment against, among other Defendants, West Face and Boland, seeking damages of $450,000,000 and punitive and/or aggravated damages of $5,000,000.

West Face and Boland have commenced a Counterclaim against, among other Defendants by Counterclaim, Catalyst and Callidus, seeking damages of $500,000,000 for, *inter alia*, defamation, conspiracy, breach of confidence, inducing breach of confidence, inducing breach of contract, inducing breach of fiduciary duty and the tort of unlawful means and punitive damages in the amount of $50,000,000.

The Counterclaim commenced by West Face and Boland alleges that the Defendants by Counterclaim have posted defamatory content on the website "westface.net". West Face and Boland commenced a motion for production and preservation of relevant evidence from the Endurance Respondents, non-parties to the Action/Counterclaim, after they discovered that iPage hosts the website "westface.net". West Face and Boland seek all evidence in the possession, control or power of the Endurance Respondents related to the website "westface.net".

The names and addresses of the parties to the Action/Counterclaim, and their representatives, along with the names and addresses of the non-party respondents to the

within motion, and their representatives (as applicable) are attached hereto as **Schedule "1"**.

**IT HAS BEEN SHOWN TO THIS COURT** that it is necessary for the purpose of justice, proportional to the needs of the Action/Counterclaim and not unduly intrusive or unduly burdensome that all evidence potentially relevant to the Action/Counterclaim that is in the possession, control or power of the Endurance Respondents, entities that are domiciled and with their principal places of business at 10 Corporate Drive, Suite 300, Burlington, Massachusetts, 01803, United States of America, be immediately preserved and produced to the Moving Parties.

**YOU ARE REQUESTED**, in furtherance of justice, to cause the Endurance Respondents, by the means ordinarily used in your jurisdiction, to immediately take steps to preserve and produce to the Moving Parties all evidence relevant to the proceeding that is in the possession, control or power of the Endurance Respondents.

**IN PARTICULAR, YOU ARE REQUESTED**, in furtherance of justice, to cause the Endurance Respondents, by the means ordinarily used in your jurisdiction, to preserve and produce the following documents, which documents have been shown to this Court to be relevant to the Action/Counterclaim and which preservation and production has been so ordered by this Court:

1.     All documents relating to the website www.westface.net hosted by the Endurance Respondents (or either of them).

2.      All documents concerning the person or persons involved with establishing, updating, paying for or using the account associated with the website "www.westface.net" and all documents that may assist with identifying such persons, including, but not limited to, all  email addresses, legal names, physical addresses, IP addresses, physical addresses associated with those IP addresses, telephone numbers, payment verification details, email verification details, profile details, telephone or SMS verification details, all "Know Your Client" information, all customer relationship management (**"CRM"**) data, and any other registration or authentication information for the account or accounts associated with the website www.westface.net.

3.      Please produce a complete cPanel export of the account associated with the website "www.westface.net."

4.      All IP address access log information regarding the account associated with the "www.westface.net" website and all IP address access information regarding the email addresses associated with that website, including all logs of customer buying and administrative activity associated with the account, any connections from the users to the account since creation of the account to present day, the date, time and time zone for each connection or login to the service by the subscriber, the date, time and time zone for each disconnection or logoff for each connection/session, the originating IP address for each and every connection/session to each account since its creation, the user agent details for each access, including browser and version, operating system and version, and any other logged information for each connection/session, and time zone used for the log information requested.

5.    All inbound emails, outbound emails, contacts added, and a full back-up or copy of the entire email server for the domain "westface.net" and any associated add-on or parked domains, including any email server records associated with the account.

6.    All communications with users of the account associated with the "www.westface.net" website, including, but not limited to emails, chats, text or SMS messages, social networks, websites, and blogs.

7.    All documents related to the publication and dissemination of any information that currently appears or has appeared on the "www.westface.net" website, including (i) a copy of all material published on the website and (ii) any records or logs relating to information about the website's visitors, including the number of visitors and number of unique visitors to the website, the dates when those visitors accessed the website, the number of times the material published on the website was read or shared from the website and the IP addresses and any identifying information related to the first 50 visitors to the website.

8.    With respect to any other website hosted by the Endurance Respondents (or either of them) that is or was established, updated, paid for and/or used by either (i) the same person or persons associated with the "www.westface.net" website and/or related email addresses, and/or (ii) other persons using the same IP addresses as the person or persons associated with the "www.wesface.net" website and/or related email addresses (the "**Other Relevant Endurance Websites and Emails**"), please produce all documents responsive to Requests 1 to 7 above as they relate to the Other Relevant Endurance Websites and Emails.

**YOU ARE REQUESTED**, in furtherance of justice, to return the executed request to the lawyers in the United States for West Face:

> Steven E. Sexton
> Sidley Austin LLP
> One South Dearborn St.
> Chicago, IL 60603
> ssexton@sidley.com
> (312) 853-2179

**AND WHEN YOU REQUEST IT**, the courts of Ontario are ready and willing to do the same for you in a similar case.

**THIS LETTER OF REQUEST** is signed and sealed by order of the Court made on July 6, 2018 .

Date    JUL 0 6 2018      Issued by                                         
(Local Registrar) Maggie Sawka

Address of    Superior Court of Justice
court office:    330 University Avenue, 7th Floor
                 Toronto ON  M5G 1R7

# SCHEDULE "1"

## LIST OF MOVING PARTIES, NON-PARTY RESPONDENTS AND PARTIES

**LAWYERS FOR THE MOVING PARTIES**

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto ON   M5V 3J7

**Kent E. Thomson (LSUC# 24264J)**
Tel:    416.863.5566
Email: kentthomson@dwpv.com
**Matthew Milne-Smith (LSUC# 44266P)**
Tel:    416.863.5595
Email: mmilne-smith@dwpv.com
**Andrew Carlson (LSUC# 58850N)**
Tel:    416.367.7437
Email: acarlson@dwpv.com

Tel:    416.863.0900
Fax:    416.863.0871

Lawyers for the Moving Parties
(Defendants / Plaintiffs by Counterclaim),
West Face Capital Inc. and Gregory Boland

**SIDLEY AUSTIN LLP**
One South Dearborn St.
Chicago, IL 60603

**Steven E. Sexton**
Tel:    312.853.2179
Email: ssexton@sidley.com

US Lawyers for the Moving Party,
(Defendant / Plaintiff by Counterclaim),
West Face Capital Inc.

**NON-PARTY RESPONDENTS**

**STARBUCKS CORPORATION D/B/A STARBUCKS COFFEE CANADA**
2401 Utah Avenue South
Seattle, Washington 98134
USA

**LAWSON LUNDELL LLP**
1600-925 Georgia Street West
Vancouver, BC V6C 3L2

**Suzanne J. Woolley**
Tel:    604.631.9280
Email: swoolley@lawsonlundell.com
**Deborah Cushing**
Tel:    604.631.9282
Email  dcushing@lawsonlundell.com

Fax:    604.669.1620

Lawyers for Cactus Restaurants Ltd. and
Cactus Café Coal Harbour Ltd.

**NELSON WATSON IN ASSOCIATION WITH WOLFE SMITH**
15 Lewis Road
Suite 101
Guelph, Ontario
N1H 1E9

**Lee Villar**
Tel:    519.821.9610
Fax:    519.821.8550
Email: lvillar@nelwat.com

Lawyers for Hawk Host Inc.

**IPAGE HOSTING, LLC**
10 Corporate Drive
Suite 300
Burlington, MA  01803
USA

**ENDURANCE INTERNATIONAL GROUP, INC.**
1500 N Priest Drive
Suite 200
Tempe, AZ  85281
USA

**PARTIES TO THE ACTION AND/OR COUNTERCLAIM**

**MOORE BARRISTERS**
Suite 1600
393 University Avenue
Toronto ON  M5G 1E6

**David C. Moore (LSUC# 16996)**
Tel:    416.581.1818 ext. 222
Fax:    416.581.1279
Email: david@moorebarristers.ca

Lawyers for the Plaintiffs (Defendants to the Counterclaim), The Catalyst
Capital Group Inc. and Callidus Capital Corporation and the Defendants to the
Counterclaim, Newton Glassman, Gabriel De Alba and James Riley

**TORYS LLP**
Barristers and Solicitors
79 Wellington Street West
Suite 3000
Box 270, TD South Tower
Toronto ON  M5K 1N2

**Andrew Bernstein**
Tel:    416.865.7678
Fax:    416.865.7380
Email: abernstein@torys.com

**Linda M. Plumpton**
Tel:    416.865.8193
Fax:    416.865.7380
Email: lplumpton@torys.com

Tel:    416.865.0040
Fax:    416.865.7380

Lawyers for the Defendants,
M5V Advisors Inc. c.o.b. Anson Group Canada, Admiralty Advisors LLC,
Frigate Ventures LP, Anson Investments LP, Anson Capital LP, Anson
Investments Master Fund LP, AIMF GP, Anson Catalyst Master Fund LP,
ACF GP, Moez Kassam, Adam Spears and Sunny Puri

**LERNERS LLP**
Barristers and Solicitors
130 Adelaide Street West
Suite 2400
Toronto ON  M5H 3P5

**Brian N. Radnoff (LSUC# 43739G)**
Tel:    416.601.2387
Fax:    416.867.2412
Email: bradnoff@lerners.ca

Tel:    416.867.3076
Fax:    416.867.9192

Lawyers for the Defendants,
Clarityspring Inc. and Nathan Anderson

**MILBURN & ASSOCIATES**
Barristers & Solicitors
20 Toronto Street
Suite 860
Toronto ON  M5C 2B8

**Jane Milburn**
Tel:    647.728.8081
Fax:    647.689.2983
Email: jmilburn@milburnlaw.ca
**Devin Jarcaig**
Tel:    647.728.8083
Email: djarcaig@milburnlaw.ca

Tel:    416.238.7865
Fax:    647.689.2983

Lawyers for the Defendant (Plaintiff by Counterclaim),
Bruce Langstaff

**ST. LAWRENCE BARRISTERS LLP**
144 King Street East
Toronto ON  M5C 1G8

**Phil Tunley**
Tel:   647.245.8282
Fax:   647.245.8285
Email: Phil.Tunley@Stlbarristers.ca

Lawyers for the Defendant,
Rob Copeland

**SCOTT VENTURO RUDAKOFF LLP**
Lawyers
1500, 222 3rd Ave SW
Calgary AB  T2P 0B4

**Eugene J. Bodnar**
Tel:    403.231.8209
Email: g.bodnar@scottventuro.com
**Breanne Campbell**
Email: b.campbell@scottventuro.com

Tel:    403.261.9043
Fax:    403.265.4632

Lawyers for the Defendant,
Kevin Baumann

**HUNT PARTNERS LLP**
1404-21 Balmuto Street
Toronto ON  M4Y 1W4

**Andrew Burns**
Tel:    416.350.2934
Fax:    416.943.1484
Email: aburns@huntlegal.com

Lawyers for the Defendant,
Kevin Baumann

**JEFFREY MCFARLANE**


Defendant

**SOLMON ROTHBART GOODMAN LLP**
Barristers and Solicitors
375 University Avenue
Suite 701
Toronto ON  M5G 2J5

**Melvyn L. Solmon**
Tel:    416.947.1093
Fax:   416.947.0079
Email: msolmon@srglegal.com

Lawyers for the Defendant,
Darryl Levitt

**SYMON ZUCKER**
70 Bond Street
Toronto ON  M5B 1X3

**Symon Zucker**
Tel:    416.863.9955
Email: sz@bondlaw.net

Lawyer for the Defendant,
Richard Molyneux

**CRAWLEY MACKEWN BRUSH LLP**
Barristers and Solicitors
179 John Street
Suite 800
Toronto ON  M5T 1X4

**Robert Brush**
Tel:    416.217.0822
Fax:   416.217.0220
Email: rbrush@cmblaw.ca
**Clarke Tedesco**
Tel:    416.217.0884
Fax:   416.217.0220
Email: ctedesco@cmblaw.ca
**Dana Carson**
Tel:    416.217.0110
Fax:   416.217.0220
Email: dcarson@cmblaw.ca

Tel:    416.217.0110
Fax:   416.217.0220

Lawyers for the Third Party,
Canaccord Genuity Corp.

**MACKENZIE BARRISTERS**
120 Adelaide Street West
Suite 2100
Toronto ON  M5H 1T1

**Gavin MacKenzie**
Tel:    416.304.9293
Fax:   416.304.9296
Email: gavin@mackenziebarristers.com
**Brooke MacKenzie**
Tel:    416.304.9294
Fax:   416.304.9296
Email: brooke@mackenziebarristers.com

Tel:    416.304.9293
Fax:   416.304.9296

Lawyers for the Defendant to the Counterclaim,
Virginia Jamieson

**EMMANUEL ROSEN**
ID No. 56548456
26 Shaar Ha'amakim Street
Hod Hasaron 4538409

Defendant to the Counterclaim

**ADAIR GOLDBLATT BIEBER LLP**
95 Wellington Street West
Suite 1830
Toronto ON  M5J 2N7

**John Adair (LSUC# 52169V)**
Tel:    416.941.5858
Email: jadair@agbllp.com
**Gord McGuire**
Tel:    416.351.2781
Fax:    416.689.2059
Email: gmcguire@agbllp.com

Tel:    416.499.9940
Fax:    647.689.2059

Lawyers for the Defendants to the Counterclaim,
B.C. Strategy Ltd. d/b/a Black Cube and B.C. Strategy UK Ltd. d/b/a Black
Cube

**INVOP LTD.**
Company number 51-517203-9
Via Adv. Hayut Grinberg
7 Menahem Begin St., (12 floor)
Ramat Gan, 5268102

Defendant to the Counterclaim

Court File No. CV-17-587463-00CL

THE CATALYST CAPITAL GROUP INC. et al.    -and-    WEST FACE CAPITAL INC. et al.    -and-    CANACCORD GENUITY CORP.

Plaintiffs                                          Defendants                                Third Party

WEST FACE CAPITAL INC. et al.              -and-    THE CATALYST CAPITAL GROUP INC. et al.

Plaintiffs by Counterclaim                          Defendants to the Counterclaim

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

PROCEEDING COMMENCED AT
TORONTO

**LETTER OF REQUEST**
(LETTER ROGATORY REQUESTING INTERNATIONAL JUDICIAL
ASSISTANCE OBTAINING EVIDENCE FOR A CIVIL MATTER)

DAVIES WARD PHILLIPS & VINEBERG LLP
155 Wellington Street West
Toronto ON  M5V 3J7

**Kent E. Thomson (LSUC# 24264J)**
Email:  kentthomson@dwpv.com
Tel:    416.863.5566

**Matthew Milne-Smith (LSUC# 44266P)**
Email:  mmilne-smith@dwpv.com
Tel:    416.863.5595

**Andrew Carlson (LSUC# 58850N)**
Email:  acarlson@dwpv.com
Tel:    416.367.7437

Tel:    416.863.0900
Fax:    416.863.0871

Lawyers for the Defendants (Plaintiffs by Counterclaim),
West Face Capital Inc. and Gregory Boland

Exhibit E

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| In re Application of | Case No. 18-mc-80179-LB |
| WEST FACE CAPITAL INC., | |
| Applicant. | **ORDER GRANTING APPLICATION TO SERVE REQUEST FOR DISCOVERY FOR USE IN A FOREIGN PROCEEDING** |
| | Re: ECF No. 1 |

## INTRODUCTION

West Face Capital Inc. is a defendant and counterclaimant in an action pending before the Ontario Superior Court of Justice in Toronto, Ontario, Canada.[1] West Face alleges that the counterclaim defendants in its Canadian action engaged in a campaign to defame it, including by making false and defamatory statements about it and its CEO in anonymous postings on various internet websites.[2] In an effort to establish that the counterclaim defendants were responsible for the anonymous statements, West Face filed an application under 28 U.S.C. § 1782 seeking leave to issue a subpoena to Google LLC for documents related to the gmail email addresses associated

---

[1] Appl. – ECF No. 1 at 2 (¶ 1). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* (¶ 2).

ORDER – No. 18-mc-80179-LB

1    with the statements.[3] Google does not oppose West Face's application.[4] The court grants West

2    Face's application to serve its proposed subpoena on Google.

3

4                                              **ANALYSIS**

5    **1. Governing Law**

6        West Face makes its application for discovery under 28 U.S.C. § 1782(a), which provides, in

7    relevant part:

8            The district court of the district in which a person resides or is found may order him
             to give his testimony or statement or to produce a document or other thing for use
9            in a proceeding in a foreign or international tribunal, including criminal
             investigations conducted before formal accusation. The order may be made
10           pursuant to a letter rogatory issued, or request made, by a foreign or international
             tribunal or upon the application of any interested person and may direct that the
11           testimony or statement be given, or the document or other thing be produced,
             before a person appointed by the court. . . . A person may not be compelled to give
12           his testimony or statement or to produce a document or other thing in violation of
             any legally applicable privilege.
13

14       A litigant in a foreign action qualifies as an "interested person" under Section 1782. *Intel*

15   *Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004). In order to apply for discovery

16   pursuant to Section 1782, a formal proceeding in the foreign jurisdiction need not be currently

17   pending, or even imminent. *Id.* at 258–59. Instead, all that is necessary is that a "dispositive

18   ruling" by the foreign adjudicative body is "within reasonable contemplation." *Id.* at 259 (holding

19   that discovery was proper under Section 1782 even though the applicant's complaint against the

20   opposing party was only in the investigative stage). An ex parte application is an acceptable

21   method for seeking discovery pursuant to Section 1782. *See In re Letters Rogatory from Tokyo*

22   *Dist.*, 539 F.2d 1216, 1219 (9th Cir. 1976) (holding that the subpoenaed parties may raise

23   objections and exercise their due process rights by bringing motions to quash the subpoenas).

24       A district court has wide discretion to grant discovery under Section 1782. *Intel*, 542 U.S. at

25   260–61. In exercising its discretion, a district court should consider the following factors:

26   ――――――――――――――――――
         [3] *Id.*
27       [4] *Id.* at 1.
28

United States District Court
Northern District of California

1   (1) whether the "person from whom discovery is sought is a participant in the foreign proceeding,"

2   (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the

3   receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial

4   assistance," (3) whether the request "conceals an attempt to circumvent foreign proof-gathering

5   restrictions or other policies of a foreign country or the United States," and (4) whether the request

6   is "unduly intrusive or burdensome." *Id.* at 264–65.

7        A district court's discretion is to be exercised in view of the twin aims of Section 1782:

8   (1) providing efficient assistance to participants in international litigation and (2) encouraging

9   foreign countries by example to provide similar assistance to our courts. *Schmitz v. Bernstein*

10  *Liebhard & Lifshitz, LLP*, 376 F.3d 79, 84 (2d Cir. 2004). There is no requirement that the party

11  seeking discovery establish that the information sought would be discoverable under the

12  governing law in the foreign proceeding or that United States law would allow discovery in an

13  analogous domestic proceeding. *See Intel*, 542 U.S. at 247, 261–63.

14       When considering an application for discovery pursuant to Section 1782, the court considers

15  first whether it has the statutory authority to grant the request and then whether it should exercise

16  its discretion to do so. *Lazaridis v. Int'l Centre for Missing and Exploited Children, Inc.*, 760 F.

17  Supp. 2d 109, 112 (D.D.C. 2011) (citations omitted).

18

19  **2.  Application**

20      **2.1    Statutory Requirements**

21       West Face's application satisfies the three minimum statutory requirements of Section 1782.

22  First, West Face's application seeks discovery from Google, whose principal place of business is

23  in the Northern District of California. Second, the requested discovery is for use in a lawsuit

24  currently pending in Canada. Third, West Face qualifies as an "interested person" because it is a

25  party to the Canadian lawsuit.

26      **2.2    Discretionary *Intel* Factors**

27       The discretionary *Intel* factors also support granting the application.

28

ORDER – No. 18-mc-80179-LB                    3

United States District Court
Northern District of California

### 2.2.1   Participant in a foreign proceeding

The first *Intel* factor asks whether the "person from whom discovery sought is a participant in the foreign proceeding." *Intel*, 542 U.S. at 264. If the person is a participant, "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad" because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Id.* "In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.*

Google is not a participant in the Canadian lawsuit. Additionally, Google maintains that the documents that West Face seeks are located in the United States and not in Canada, and thus they appear to be out of the immediate reach of the Canadian court.[5] This factor weighs in favor of granting the application. *Cf. Thompson v. Doel*, No. 5:13-cv-80088-EJD-PSG, 2013 WL 5544607, at *2 (N.D. Cal. Oct. 7, 2013).

### 2.2.2   Nature of the foreign tribunal and receptivity to U.S. federal-court judicial assistance

The second *Intel* factor requires the court to "take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264.

The Canadian court expressly requested the assistance of this court in obtaining documents from Google and thus appears receptive to U.S. federal-court judicial assistance.[6] This factor weighs in favor of granting the application.

---

[5] Appl. – ECF No. 1 at 3 (¶ 7); Mem. of Law – ECF No. 1-2 at 6.

[6] Appl. Ex. B (Canadian court order) – ECF No. 1-5 at 26 ("THIS COURT FURTHER REQUESTS the assistance of the United States District Court for the Northern District of California in aiding the Moving Parties in obtaining documents from Google by the means ordinarily used in that jurisdiction to obtain documents from a non-party[.]").

### 2.2.3    Attempt to circumvent foreign proof-gathering restrictions or policies

The third *Intel* factor considers whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 264–65.

The Canadian court expressly held that this application was not an attempt to circumvent Canadian proof-gathering restrictions.[7] This factor weighs in favor of granting the application.

### 2.2.4    Undue intrusion or burden

The fourth *Intel* factor is whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265.

Google does not oppose West Face's application, and the discovery West Face seeks does not appear on its face to be unduly intrusive or burdensome. West Face further states that it is willing to meet and confer with Google if Google believes that any of its requests are unduly burdensome.[8] This factor weighs in favor of granting the application. *Cf. In re Darmon*, No. 17-mc-80089-DMR, 2017 WL 3283969, at *3 (N.D. Cal. Aug. 2, 2017) (finding that "proposed subpoena [that] requests documents that establish or would help to establish the identity of the author of the blog posts on Wordpress.com" "does not appear to be unduly burdensome and is appropriately tailored").[9]

## CONCLUSION

For the foregoing reasons, the court grants West Face's application to serve its proposed subpoena on Google.

---

[7] *Id.* (Canadian court order) ("THIS COURT DECLARES that the documents to be sought by the Moving Parties in the United States may be relevant and necessary to the just determination of the Moving Parties' Counterclaim in this Action, and the Moving Parties; intent to seek production of such documents in the United States is consistent with and not contrary to this Court's continued jurisdiction with respect to this Action and is not an attempt to circumvent the proof-gathering process in Canada[.]").

[8] Appl. – ECF No. 1 at 4 (¶ 7); Mem. of Law – ECF No. 1-2 at 8.

[9] This does not preclude Google from contesting the subpoena. *Cf. Darmon*, 2017 WL 3283969, at *4.

ORDER – No. 18-mc-80179-LB                    5

1    If Google wants to contest the subpoena, it must notify West Face that it wishes to do so

2    before the return date of the subpoena. Then, in lieu of a formal motion to quash, the parties must

3    engage in the meet-and-confer and joint-letter-brief process set out in the court's standing order,

4    which is attached to this order.

5        West Face must serve Google with a copy of this order and a copy of the standing order when

6    it serves its subpoena.

7

8    **IT IS SO ORDERED.**

9    Dated: October 12, 2018

10

11                                          LAUREL BEELER
                                            United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Exhibit F

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE APPLICATION OF WEST FACE )
CAPITAL INC. FOR AN ORDER )
GRANTING LEAVE TO ISSUE )
DOCUMENT SUBPOENAS PURSUANT )
TO 28 U.S.C. § 1782 )
                                  )
        Applicant. )   Case No. 1:18-mc-91309-LTS
                                  )

## [PROPOSED] ORDER

This matter having come before the Court upon the application of West Face Capital Inc. ("West Face") pursuant to 28 U.S.C. § 1782 for leave to issue subpoenas to Endurance International Group Holdings, Inc., Endurance International Group, Inc., and iPage Hosting LLC (collectively, "Endurance"), due notice having been given to Endurance and the Court having received no objection from Endurance, and the Court having reviewed West Face's application and accompanying memorandum of law, the Declaration of Kathryn L. Alessi, and the July 6, 2018 letter rogatory issued from the Ontario Superior Court of Justice, Commercial List, in Toronto, Ontario, Canada requesting this Court's judicial assistance in obtaining evidence for a civil lawsuit, and the Court having found that West Face's application satisfies the requirements and discretionary factors of 28 U.S.C. § 1782 for the reasons stated in West's application and accompanying memorandum of law, the Court hereby ORDERS:

IT IS ORDERED that West Face is granted leave to issue to Endurance document subpoenas in the form attached to West Face's application, and this Court retains jurisdiction to address any disputes that may arise over the enforcement of the subpoenas.

Dated: 7/24/2018                    /s/ Leo T. Sorokin
                                United States District Judge

## CERTIFICATE OF SERVICE

I, Kathryn L. Alessi, hereby certify that I am causing a copy of the foregoing proposed

Order to be personally served on the following parties:

> CT Corporation System
> As Registered Agent of Endurance International Group Holdings,
> Inc. and Endurance International Group, Inc.
> 155 Federal St., STE 700
> Boston, Massachusetts 02110

And to be sent by U.S. Mail to the following parties:

> Jeffrey Fox, President
> Endurance International Group Holdings, Inc.
> Endurance International Group, Inc.
> iPage Holdings, LLC
> 10 Corporate Drive, Suite 300
> Burlington, Massachusetts 01803

And to be sent by Email to the following parties:

> Jenessa Smith (legal@ipage-inc.com)
> Endurance International Group Holdings, Inc.
> Endurance International Group, Inc.
> iPage Holdings, LLC

> */s/ Kathryn L. Alessi*